*598 I. Introduction, Statement of Facts, and Procedural History
"Nearly any consent decree can be viewed simultaneously as 'a crackdown or a sellout.' " United States v. Telluride Co., 849 F.Supp. 1400, 1402 (D. Colo. 1994) (quoting William A. Rodger, Jr., 2 Environmental Law: Air and Water, § 4.40 at 584 (1986) ). This quote rings especially true for the settlement that this court has been tasked with reviewing. After eleven years of litigation, including a sixty-six day trial before this court, the New Jersey Department of Environmental Protection ("DEP," "State," or "Department") and ExxonMobil Corporation ("Exxon") have agreed to a consent judgment ("Proposed Consent Judgment" or *599 "Consent Judgment") that resolves the State's claims for *295 natural resource damages in New Jersey Department of Environmental Protection v. Exxon Mobil Corp., No. UNN-L-3026-04, consolidated with No. UNN-L-1650-05 ("Bayway/Bayonne Litigation"). The Consent Judgment also resolves (1) the State's pending claims in New Jersey Department of Environmental Protection v. Exxon Mobil Corp. f/k/a GATX Terminals Corp., No. L-1063-07, consolidated with No. L-0563-03; and (2) certain potential claims the DEP may have against Exxon at fifteen other facilities and 1768 retail gas stations.
After giving considerable time and thought to its task, for the reasons stated in this opinion, the court finds that the proposed consent judgment is fair, reasonable, in the public interest, and consistent with the goals of the Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-23.11 to -23.24. It therefore approves the Consent Judgment. The facts and procedural history have been set out in a number of previously issued opinions.[1] However, because an understanding of this case's facts and history is integral to understanding the court's approval of the Proposed Consent Judgment, the court provides its own Statement of Facts and Procedural History.
*600 I.A. Statement of Facts
During the mid-1800s, the Constable Hook peninsula, which is located in the Upper New York Bay, was composed of salt marshes and intertidal wetlands. Farming was the main local occupation at this time, but by the 1870s, industry began to spring up.[2] One such operation was the Prentice Oil Company, which was established in 1875 and produced kerosene. It is this company that John D. Rockefeller, through his Standard Oil Company,[3] first set his sights on in establishing what would become the Bayonne Facility ("Bayonne") at issue in this case.[4]
Although Prentice had only twenty employees when Standard Oil acquired it in 1877, Standard soon began to extensively modify the land, expand its holdings, and develop infrastructure for an oil refinery. For example, to eliminate the cost of shipping oil to the coast, in 1887 Standard finished constructing an oil pipeline that transported 10,000 barrels of crude oil from the fields of Pennsylvania directly to Bayonne for processing. Outward expansion continued until the refinery hit its peak in 1936, at which time it employed *296 5000 workers and consisted of 650 acres. After this time, Standard began selling off tracts of land. Even though all refining and manufacturing had ceased by 1971, the site continued to function as a petroleum storage facility and wholesale distribution center. In 1993, Exxon sold approximately 210 acres of the site to International Matex Tank Terminals ("IMTT"), while still retaining ownership of a few acres.[5]
At the turn of the twentieth century, the land that would eventually become the Linden Bayway Refinery ("Bayway") was *601 similarly composed of marshes and wetlands.[6] Although farming used to be the main occupation, by the time Standard Oil began acquiring land in 1907, the area was beginning to industrially develop. For instance, the Pennsylvania and Short Line Railroads of Monopoly fame cut across the area. After Standard first acquired land at Bayway, it began constructing refinery infrastructure and did not begin producing petroleum products until 1909. Over the course of the 1900s, Exxon continued to expand operations, refine crude oil, and manufacture chemicals until December 1992, when it sold the site to the Bayway Refining Company, a wholly-owned subsidiary of the Tosco Corporation. Tosco ultimately sold the site to Conoco, which in turn sold it to Phillips 66. Currently, Bayway is owned by both Phillips 66 and Infineum, although several other companies have easements and leaseholds.
During the course of Exxon's ownership and operation of the two sites, large amounts of hazardous substances,[7] including petroleum products, were discharged into the lands and waters at and near the sites. To address the cleanup of this chronic contamination, the State and Exxon voluntarily entered into two Administrative Consent Orders ("ACOs") on December 19, 1991. Although Exxon denied any statutory or regulatory violation, they agreed to pay a civil penalty of $1,500,000 for Bayway and $1,350,000 for Bayonne. In order to "determine the nature and extent of the problems presented by the discharges of hazardous substances and pollutants at the Site[s]," Exxon and the Department agreed on the necessity to conduct a remedial investigation and feasibility study of remedial action alternatives. They also agreed "to develop and implement a plan for remedial action to remove or remediate the hazardous substances and pollutants from the Site[s]." Through December 31, 2014, Exxon has spent $136,101,470 in *602 remediation-related costs for Bayway and $121,616,000 in remediation-related costs for Bayonne. Importantly, both ACOs contained a "Reservation of Rights" section that stated, "This Administrative Consent Order shall not be construed to affect or waive the claims of federal or State natural resources trustees against any party for damages for injury to, destruction of, or loss of natural resources."
I.B. Procedural History
On August 19, 2004, the DEP elected to exercise this reserved right and filed two complaints against Exxon for alleged injuries to natural resources at Bayway and Bayonne.[8] The complaints brought statutory *297 Spill Act claims, as well as common law public nuisance and trespass claims, for alleged injuries to groundwater, surface water, and ecological resources. On October 7, 2004, Exxon attempted to remove the case to the United States District Court for the District of New Jersey. This attempt was unsuccessful, and the matter was remanded back to the Superior Court by a March 24, 2005, order. Pursuant to a January 11, 2006, case management order, Judge Ross Anzaldi, the motion judge at the time, bifurcated the case between the State's Property Claims and Surface Water Claims.[9]
On the same date, the DEP moved for partial summary judgment, seeking a determination that Exxon was strictly liable as a matter of law for all cleanup and removal costs under the Spill Act, including the restoration of natural resources. Exxon cross-moved for summary judgment on the ground that the Spill Act *603 does not provide liability for "loss of use" of natural resources. On May 26, 2006, Judge Anzaldi granted both motions in part, holding that Exxon was strictly liable under the Spill Act for natural resource damages ("NRD"), including restoration, but dismissing the DEP's Spill Act claims for loss of use damages. N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., 393 N.J. Super. 388, 397-98, 923 A.2d 345 (App. Div. 2007) (hereinafter " Exxon I"). Although Exxon elected not to appeal the strict liability ruling, the DEP sought an interlocutory appeal on the loss of use issue. Id. at 398, 923 A.2d 345. After examining the Spill Act's language, intent, and recent amendments, the Appellate Division reversed and held that loss of use damages "are a component of costs of mitigating damage to public natural resources." Id. at 402, 923 A.2d 345.
While this appeal was pending, on November 3, 2006, the State's natural resource damage assessment ("NRDA") expert, Stratus Consulting, issued its damages report. At Bayway, the report identified 1252 acres of intertidal wetland, palustrine meadow/forest ("palustrine meadow"), and upland forest/meadow ("upland meadow") habitats that were contaminated. At Bayonne, the report identified 475.7 acres of contaminated habitats. Stratus quantified these damages at $8.9 billion, $2.5 billion for on-site "primary restoration" and $6.4 billion for off-site "compensatory restoration."[10]
After the Appellate Division decided Exxon I in the State's favor, the DEP moved to amend its complaints to include common law strict liability counts. N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., 420 N.J. Super. 395, 398, 22 A.3d 1 (App. Div. 2011) (hereinafter " Exxon II"). Exxon then moved for partial summary judgment, seeking to dismiss the strict liability counts on the theory that the statute of limitations had run and that the extension statute, N.J.S.A. 58:10B-17.1, did not apply.[11] Ibid. On July *604 23, 2009, Judge Anzaldi *298 ruled in Exxon's favor and dismissed the DEP's common law strict liability counts. Id. at 401, 22 A.3d 1. On May 31, 2011, the Appellate Division reversed and held that the statute of limitations did not bar the common law strict liability counts because the common law could be considered part of the State's environmental laws, which have been legislatively granted an extension on their statute of limitations.[12] Id. at 411, 22 A.3d 1.
During 2009, Judge Anzaldi also made three key rulings, none of which were appealed by the losing party. First, on January 22, 2009, he ruled that the Spill Act applies retroactively for natural resource damages that occurred before 1977, the year the Act came into effect. N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., No. UNN-L-3026-04 (Law Div. Jan. 22, 2009) (slip op. at 5) (hereinafter " Retroactivity Ruling"). Second, on June 5, 2009, he granted Exxon's "physical modification" motion. This ruling dismissed "the DEP's claims, under the Spill Act and the common law, for damages for injuries to natural resources of the State on the Bayway and Bayonne sites that are the result of physical modifications to the Bayway and Bayonne sites."
*605 N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., No. UNN-L-3026-04 (Law Div. June 5, 2009) (slip op. at 1) (hereinafter "Physical Modification Ruling"). Finally, in his July 24, 2009, Public Trust Ruling, he held that "[a]ny lands which are contaminated as a result of actions by Exxon or its predecessors could be subject to damages under the Spill Act." N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., No. UNN-L-3026-04 (Law Div. July 24, 2009) (slip op. at 4), 2009 WL 2494754 (hereinafter " Public Trust Ruling"). With these rulings decided, and settlement negotiations unable to bear fruit, the parties prepared for trial, which was to begin January 2014.[13]
I.C. The Parties' Experts and the Trial
Each side assembled a host of expert witnesses for what was agreed to be the "battle of experts" that was to unfold over the coming months. The only thing matching the number of each side's expert witnesses was the number of "Rule 104 Motions"[14] that the opposing side filed in an *299 attempt to exclude the opposing witnesses: the State retained eight experts, seven of which Exxon sought to exclude with Rule 104 Motions; Exxon sought to introduce six experts, and the State countered with six Rule 104 Motions. Such hearings are normally held before the expert testifies and outside the presence of the jury so that the jury will not hear inadmissible testimony if the judge ultimately excludes the expert. In the interest of judicial economy, because the present case was to be a bench trial expected to last many months, the court and the parties agreed to allow all experts to testify at trial. The parties agreed that post-trial, the court would then decide the pending Rule 104 Motions. Further, it was agreed that *606 the court would not consider the testimony of excluded experts in forming its opinion.
The court intended to release its Rule 104 decisions as part of its opinion. Due to the settlement of this case, that opinion, and thus the Rule 104 rulings that it contains, has not been released. However, a brief discussion of each side's experts is warranted in order to understand this court's approval of the Proposed Consent Judgment.
The State proffered Dr. Joshua Lipton and Dr. Eldon Blancher II of the aforementioned Stratus Consulting, their central witnesses, as experts in the fields of (1) natural resource damage assessment; (2) environmental toxicology and chemistry; (3) ecology; and (4) environmental science. The State retained Lipton to determine the extent of natural resource injury to the Bayway and Bayonne sites and to quantify the value of any allegedly lost resources or services. Although Blancher did not testify at trial, he collaborated with Lipton to produce the combined expert report on injury and damages at the sites (the "Stratus Report"). As mentioned above, Lipton testified that this Report quantified primary restoration damages at $2.5 billion and compensatory restoration damages at $6.4 billion. To arrive at this $6.4 billion figure, Lipton employed a Habitat Equivalency Analysis ("HEA"), a complex, mathematical methodology. Lipton's HEA required a number of inputs, which Exxon contested, for the formula to reach its ultimate output: the $6.4 billion figure. Some of these inputs were allegedly within Lipton's area of expertise, such as (1) the number of injured acres of certain habitats; (2) the per-acre cost to restore allegedly injured intertidal, subtidal, and palustrine meadow habitats; (3) the alleged start dates for the accrual of damages; (4) how long it would take to implement restoration; (5) the end date for the benefits of restoration; (6) the base year by which to measure the value of a dollar; and (7) the proper discount rate. For two other key inputs, the State needed to retain other witnesses.
*607 The first of these was Dr. Emily Southgate, who opined on the condition of Bayonne and Bayway prior to Standard Oil's arrival. The State sought to have her qualified as an expert in the field of historical ecology. Her testimony was critical to the State's case for two reasons. First, her opinion on the sites' condition before Standard Oil's arrival was important because the Appellate Division has held that the Spill Act "requires the return of natural resources to their pre-discharge condition." Exxon I, 393 N.J. Super. at 405-06, 923 A.2d 345. Secondly, the sites' condition was important because one of the inputs to Lipton's HEA was the habitat condition prior to the accrual of damages, i.e. the first discharge.
The second of these expert witnesses was Robert Williams, a proffered expert in the fields of forestry, forest reforestation, and forest restoration cost estimation. The State retained Williams to estimate the *300 cost of restoring an uplands meadow as part of their overall restoration plan. Williams' estimate was key to determining the per-acre uplands meadow restoration cost input for the HEA.
In support of its claim for on-site primary restoration at Bayway and Bayonne, the State retained Randy Horsak, head of the consulting firm 3TM, and sought to have him qualified in the fields of environmental engineering and engineering cost estimation. Horsak's charge was to give cost estimates of the State's proposed wetlands restoration project and overall cost for primary restoration at Bayway and Bayonne. The State also sought to introduce Ronald Ostermiller, a purported expert in the fields of engineering, project development, conceptual design, and cost estimation. He testified to support the State's assertion that its primary restoration plan was practicable, as required under the Spill Act. N.J.S.A. 58:10-23.11u(b)(4).
The State's final two witnesses were John Sacco, current head of the Office of Natural Resources Restoration, and Dr. Robert Morrison, a chemist. The State offered Sacco as an expert in the fields of (1) environmental management, including restoration *608 projects; (2) environmental science with emphasis on coastal ecosystems and restoration; (3) applied ecology; (4) natural resource damage assessment practice in New Jersey; and (5) New Jersey trust resources. Morrison was retained to review Exxon's soil sampling results from Bayway and Bayonne and develop a database of chemicals detected in the soils and sediments. Although Exxon did not seek to exclude Morrison's opinions on Rule 104 grounds, it retained its own chemist, who sought to undercut these opinions.[15]
This expert was Dr. Paul Boehm, whom Exxon proffered in the fields of (1) environmental organic chemistry; (2) environmental forensics; (3) environmental assessment and chemistry; and (4) fate and transport of chemicals. Exxon retained Boehm (1) to review Lipton's and Morrison's reports, to understand the methodologies that they used, and to determine whether those were generally accepted methodologies; and (2) to analyze the chemical background information in the Bayonne and Bayway areas. In a further effort to undermine Lipton's and Morrison's testimony, Exxon retained Dr. Thomas Ginn, whom they proffered as an expert in the fields of (1) ecotoxicology; (2) ecology; (3) natural resource damage assessments; (4) habitat equivalency analysis; (5) environmental risk assessment; and (6) resource equivalency analysis. Exxon retained him to (1) review the State's expert reports and give opinions on them; (2) evaluate the ecological conditions at Bayway and Bayonne; and (3) provide his own opinions concerning the injuries to natural resources at the sites. As another critique of not only the Stratus Report, but also Horsak's 3TM Report, Exxon retained Dr. John Rodgers and proffered him as an expert in the fields of (1) wetlands; (2) construction and restoration of wetlands; (3) estimating costs of wetland construction and restoration; (4) ecotoxicology; and (5) environmental toxicology.
*609 These three proffered experts collaborated with Dr. William Desvousges, who was to be Exxon's counterpart to Lipton. Exxon offered him as an expert in the fields of economics and natural resource damage assessments and the subfield of natural resource economics. Exxon retained Desvousges to (1) provide an objective assessment of potential economic losses *301 associated with Bayway and Bayonne; and (2) evaluate the expert reports of the State's witnesses. In addition to pointing out alleged flaws in Lipton's NRDA and HEA, Desvousges, along with Boehm, Ginn, and Rodgers, formulated his own HEA, which estimated damages as being between $1.4 million and $3 million.
Exxon proffered Dr. Maury Klein as an expert in the field of history and retained him to discuss (1) the value of wetlands and how this value has changed over time; (2) the benefits New Jersey received from the Bayonne and Bayway refineries; and (3) the role these refineries played in World War II ("WWII"). By showing how the value of wetlands has changed over time, Exxon sought to discredit Lipton's HEA. They argued that for a HEA to reliably function, a key assumption was that the value of the natural resource must not change over time. As for the alleged refinery benefits and refineries' role during WWII, Exxon sought to argue that they deserved a credit for these benefits and that the State could not recover damages during the War years under the Spill Act's "Act of War" affirmative defense. N.J.S.A. 58:10-23.11g(d)(1).
Last was Dr. Tod Delaney, whom Exxon offered as an expert in the fields of engineering and site investigations. Exxon retained Delaney to examine the Bayway and Bayonne site development from the commencement of infrastructure construction until the late 1970s. With his testimony, Exxon sought to show that, pursuant to Judge Anzaldi's Physical Modification Ruling, all or most of the State's alleged natural resource damages were not due to the discharge of hazardous substances, but rather lawful industrial modifications. See N.J.S.A. 58:10-23.11b (defining "discharge" as "any intentional or unintentional action or omission resulting in *610 the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State, or into waters outside the jurisdiction of the State when damage may result to the lands, waters or natural resources within the jurisdiction of the State").
From January to September 2014, this court heard sixty-six days of trial, which included expert opinion testimony, factual lay testimony, and two days for closing arguments. At the end of trial, the court set off to begin work on its written opinion, which it estimated would not be ready until Spring 2015. In November 2014, the parties submitted their extensive post-trial briefs, which maintained the same positions they asserted at trial. Then, in February 2015, a letter from the parties arrived notifying the court that they were on the cusp of reaching a settlement. On February 20, 2015, they notified the court that an agreement had been struck.
II. The Proposed Consent Judgment
Under the terms of the Proposed Consent Judgment, Exxon agrees to pay the state "$225 million by certified check made payable to 'Treasurer, State of New Jersey,' or by wire transfer pursuant to instructions provided by the [State]." The State shall place that money into a segregated account within the Hazardous Discharge Site Cleanup Fund, where it will earn interest and shall not be used by the State for any purpose, until the Consent Judgment becomes final and non-appealable. In return, the State (1) releases with prejudice and covenants not to sue Exxon for all claims that it asserted or could have asserted in the Bayway/Bayonne Litigation; (2) dismisses the Surface Water Claims without prejudice and agrees that the Surface Water Claims can only be brought in the future in a multi-defendant action if a formal natural resource damage assessment is completed by the applicable *302 trustee through a procedure that allows for Exxon's participation; (3) releases with prejudice and covenants not to sue Exxon for all NRD relating to Exxon Retail Stations (the "Retail Gas Stations") located within the state (this excludes any claims involving *611 an Exxon Retail Station where methyl tertiary butyl ether ("MTBE") has been discharged); (4) releases and covenants not to sue Exxon for all NRD relating to sixteen facilities listed in Attachment C (the "Attachment C Facilities"), excluding any claims involving any facility listed on Attachment C where MTBE has been discharged (one of these facilities is the Former Paulsboro Terminal # 3045 that has been the subject of ongoing litigation in Gloucester County, New Jersey Department of Environmental Protection v. Exxon Mobil Corp. f/k/a GATX Terminals Corp., No. L-1063-07 consolidated with No. L-0563-03 ("Paulsboro Litigation");[16] and (5) agrees to defer the final determination and remediation for Morses Creek until the cessation of refining operations at the [Bayway] site, which will be when operational conditions at [Bayway] no longer require the regular discharge into Morses Creek of 30 million gallons per day or more of once-through non-contact cooling water pursuant to NJPDES Permit No. NJ0001511 (or as renewed/reissued).
Further, the parties agree that (1) each party shall bear its own costs and expenses in the Bayway/Bayonne Litigation and Paulsboro Litigation; (2) the Proposed Consent Judgment will not alter, suspend, or otherwise impact Exxon's obligations under any ACOs, with the exception of the Morses Creek deferral;[17] (3) the State shall retain full authority and sole discretion to require Exxon to take any action to "address an immediate environmental concern, an imminent and substantial endangerment to public health, welfare or the environment, or an emergency response arising from or related to the Bayonne Facility, the Bayway *612 Facility, any of the ExxonMobil Retail Stations, and any of the sites listed in Attachment C"; and (4) Exxon will not "sue or assert any claim or cause of action against the State concerning the Matters Addressed."
The agreement also states that "[n]othing contained in this Consent Judgment shall be considered an admission by [Exxon] ... of any wrongdoing or liability on [its] part," and it grants Exxon contribution protection "to the fullest extent possible pursuant to Section 113(f)(2) of [the Comprehensive Environmental Response, Compensation, and Liability Act] CERCLA, 42 U.S.C. §§ 9613(f)(2), the Spill Act, N.J.S.A. 58:10-23.11f(a)(2)(b) and any other statute, regulation, or common law principle that provides contribution rights against ExxonMobil ...." Finally, the agreement contains a non-severability clause that states:
All Sections, Paragraphs and provisions of the Consent Judgment (except headings and section titles) are integral to the Consent Judgment, and any Court Order that does not approve this Consent Judgment in its entirety or attempts *303 to modify this Consent Judgment, except as to ministerial changes, shall cause this Consent Judgment to be void and of no effect, unless otherwise agreed in writing by the Parties.
In accordance with N.J.S.A. 58:10-23.11e2, the State published a copy of the Proposed Consent Judgment on the DEP's website, published notice in the New Jersey Register, and arranged for notice in twelve newspapers. Details of the settlement were made public April 6, 2015. The settlement immediately received extensive public backlash and has since been the topic of a number of media sources. Although the DEP usually gives the public thirty days to comment on any proposed settlement, due to the heightened public interest, it extended the time period prescribed in N.J.S.A. 58:10-23.11e2 to sixty days. This Public Comment Period ended June 5, 2015, by which time the DEP had received 16,013 public comments ("Public Comments" or "Public Commenters"), the vast majority of which were opposed to the settlement. The purpose of soliciting these comments is twofold. First, in any settlement under the Spill Act, the DEP reviews the comments before it decides to make a formal application for approval of a settlement. Second, the court ultimately charged with approving a *613 settlement can review the comments for assistance in determining if the settlement is fair, reasonable, and in the public interest.[18]
On June 9, 2015, the New York/New Jersey Baykeeper, New Jersey Sierra Club, Clean Water Action, Delaware Riverkeeper, Delaware Riverkeeper Network, Environment New Jersey, Natural Resources Defense Council, and New Jersey Audubon (the "Environmental Groups") collectively filed a motion to intervene as of right under Rule 4:33-1 or, alternatively, for permissive intervention under Rule 4:33-2. On June 19, 2015, New Jersey State Senator Raymond Lesniak, individually and as a member of the New Jersey State Senate for the 20th Legislative District (Union), filed motions seeking intervention under the same court rules. The Environmental Groups and Senator Lesniak opposed the Proposed Consent Judgment and sought to intervene so that they could (1) brief and orally argue against the Consent Judgment; and (2) have a right of appeal should the court approve it.
On July 13, 2015, the court denied these motions without prejudice. N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., No. UNN-L-3026-04 (Law Div. July 13, 2015) (slip op. at 32), 2015 WL 10015127 (hereinafter " Exxon III").[19] The court invited the movants to apply for amicus status, something that both the State and Exxon had indicated they would not oppose. Although the court initially intended to hold oral argument on the Consent Judgment July 21, 2015, it delayed the hearing for nine days in order to give the Environmental Groups and Senator Lesniak *614 (collectively "Amici") time to apply for amicus status and submit amicus briefs.
Less than three days before this hearing was to occur, on July 27, 2015, the Environmental Groups, through counsel, notified *304 the court that they were appealing Exxon III and filed a motion with the court requesting a stay. On July 30, 2015, after hearing oral argument on the stay request, the court denied the request. N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., No. UNN-L-3026-04 (Law Div. July 13, 2015) (slip op. at 12), 2015 WL 10015127. That same day, the court heard oral argument on the Proposed Consent Judgment. Urging approval were Acting Attorney General John Hoffman, the State's special counsel, and counsel for Exxon. Amici urged the court to deny the Consent Judgment. At the time this court released this opinion, the Appellate Division had not yet ruled on the Environmental Groups' motion for leave to appeal.
III. Standard of Review and Application of that Standard to the Proposed Consent Judgment
In certain respects, this is a case of first impression for New Jersey state courts, which have never adopted a Spill Act consent judgment review standard. When reviewing Spill Act settlements, federal courts apply the same standard to these settlements that they apply to federal CERCLA settlements. See, e.g., N.J. Dep't of Envtl. Prot. v. Atl. Richfield Co. (In re Methyl Tertiary ButylEther "MTBE" Prods. Liab. Litig.), 33 F.Supp.3d 259, 264 (S.D.N.Y. 2014) (citing Reichhold, Inc. v. U.S. Metals Ref. Co., 655 F.Supp.2d 400, 444 (D.N.J. 2009) ; N.J. Dep't of Envtl. Prot. v. Gloucester Envtl. Mgmt. Servs., Inc., 821 F.Supp. 999, 1009 (D.N.J. 1993) ). Under this standard, courts review consent decrees to ensure they are fair, reasonable, consistent with CERCLA's goals, and in the public interest.[20] Additionally, the DEP, Exxon, and Amici all agree that the court should apply this standard. Despite this general consensus, the Spill Act does not *615 mandate a specific settlement review standard,[21] and this court is aware of no New Jersey state court that has adopted any specific standard. Indeed, neither the parties nor Amici have pointed to any such case. For the reasons stated below, however, the court will adopt this standard: Spill Act consent judgments, whether approved judicially or administratively, should be fair, reasonable, faithful to the objectives of the Spill Act, and in the public interest.
This section proceeds by first discussing a court's role in reviewing a CERCLA settlement. It then explains why the federal standard is harmonious with New Jersey general settlement caselaw. This section will then conclude with a number of subsections that explain why the Proposed Consent Judgment is (1) procedurally fair; (2) substantively fair; (3) reasonable; and (4) consistent with the Spill Act's intent and goals. Section IV will then address specific objections to the Proposed Consent Judgment and explain why it is in the public interest.
* * *
The policy of the law to encourage settlements has particular force where "a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement." Cannons, 899 F.2d at 84 (citing F.T.C. v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 408 (1st Cir. 1987) ). Although judicial deference is warranted in *305 these situations, "the true measure of the deference due depends on the persuasive power of the agency's proposal and rationale, given whatever practical considerations may impinge and the full panoply of the attendant circumstances." Ibid. (quoting Standard Fin., 830 F.2d at 408 ). "Respect for the agency's role is heightened in a situation where the cards have been dealt face up and a crew of *616 sophisticated players, with sharply conflicting interests, sit at the table." Ibid.
In such situations, "the district court must refrain from second-guessing the Executive Branch," as the standard "is not whether the settlement is one which the court itself might have fashioned, or considers ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute." Ibid. (emphasis added) (citing Durrett v. Housing Auth., 896 F.2d 600, 604 (1st Cir. 1990) ); see also United States v. Charles George Trucking, 34 F.3d 1081, 1085 (1st Cir. 1994) ("[A] trial court, without abdicating its responsibility to exercise independent judgment, must defer heavily to the parties' agreement and the EPA's expertise."); Arizona ex rel. Woods v. Nucor Corp., 825 F.Supp. 1452, 1456 (D. Ariz. 1992) ("Thus, the court will not conduct a de novo review of the merits of the proposed settlement, but neither will it 'mechanistically rubberstamp' the Agreement." (quoting Cannons, 899 F.2d at 84 ) ); In re Acushnet River & New Bedford Harbor, 712 F.Supp. 1019, 1032 (D. Mass. 1989) (stating that courts are "not required to ensure that the sovereigns have struck the best deal possible"). This is so due to "congressional intent concerning the role of agency expertise," and because the "federal courts have neither the time nor the expertise to do so, and CERCLA has properly left the scientific decisions regarding toxic substance cleanup to the President's delegate, the EPA administrator and his staff." United States v. Akzo Coatings of Am., 949 F.2d 1409, 1424 (6th Cir. 1991). While giving proper deference, courts are to "ensure that the agency has considered all the relevant evidence in the record and has acted within the public interest." Id. at 1426 ; see also Plaskett v. Esso Standard Oil S.A. (In re Tutu Water WellsCERCLA Litig. ), 326 F.3d 201, 207 (3d Cir. 2003) ("Where the appropriate agency has reviewed the record and has made a reasonable determination of fault and damages, that determination is owed some deference."). "Protection of the public interest is the key consideration in assessing whether a decree is fair, reasonable and adequate."
*617 Akzo, 949 F.2d at 1435 (citing Acushnet River, 712 F.Supp. at 1028 ; United States v. Ketchikan Pulp Co., 430 F.Supp. 83, 86 (D. Ala. 1977) ); see also United States v. Kramer, 19 F.Supp.2d 273, 280 (D.N.J. 1998) (stating that Congress intended federal courts to take "into account the interests of the public at large, the settling parties and the non-settlers alike").
The fairness and reasonableness of a consent decree are "pragmatic concepts, and evaluating them requires common sense, practical wisdom, and a dispassionate assessment of the attendant circumstances." Charles George, 34 F.3d at 1085. This court finds that pragmatic evaluation does not require "mathematical exactitude" or "precise calculations." This is due to the reality that "[i]n settlement negotiations, particularly in the early phases of litigation, precise data relevant to determining the total extent of harm caused and the role of each PRP is often unavailable." Cannons, 899 F.2d at 88 (citing Superfund Settlements with De Minimis Waste Contributors: An Analysis of Key Issues by the Superfund Settlements Project, May 8, 1987, Vol. XIV Chem.
*306 Waste Lit. Rptr. 34, 46 (June 1987) );[22] see also Charles George, 34 F.3d at 1088 ("[A] muddled record is the norm in most CERCLA litigation."). Courts do not "leave matters in limbo until more precise information is amassed" because to do so "would disserve a principal end of the statute-achievement of prompt settlement and a concomitant head start on response activities ...." Cannons, 899 F.2d at 88. As long as the data "falls along the broad spectrum of plausible approximations, judicial intrusion is unwarranted ...." Ibid. (citing United States v. Rohm & Haas, 721 F.Supp. 666, 685-86 (D.N.J. 1989) ). Courts must "compare the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them, and then factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified." United States v. Montrose Chem. Corp., 50 F.3d 741, 747 (9th Cir. 1995) (citing *618 Charles George, 34 F.3d at 1087 ).[23] A final consideration is that although it is "self-evident that generally defendants do not settle litigation for the full value of the asserted damages .... [I]n the general run of CERCLA cases ... defendants will generally settle for substantially less-indeed, often for far less given the inherent problems of proof in these cases-than the asserted damages." Acushnet River, 712 F.Supp. at 1032 (emphasis added).
Although the court's task is "quite limited," Rohm & Haas, 721 F.Supp. at 685, the standard is not without teeth. Courts should deny proposed consent decrees if they do not have "at least an estimate of the projected total natural resource damages at issue in th[e] case." Montrose, 50 F.3d at 743 (rejecting a proposed consent decree because the government's preliminary damage estimate was known only to the Special Master and not the district court judge). This estimate is necessary so that courts have some benchmark with which to compare proposed consent decrees. Id. at 746. Once they have this information, courts must "actually engage with [it] and explain in a reasoned disposition why the evidence indicates that the consent decrees" meet CERCLA's standard. Arizona v. City of Tucson, 761 F.3d 1005, 1012 (9th Cir. 2014) (rejecting a proposed consent decree because, inter alia, the district court's "entire numerical analysis [was] found in a single footnote" and its "opinion even fail[ed] to mention the parties' individual and aggregate settlement amounts"). Importantly, courts must remember that deference "does not mean turning a blind eye to an empty record on a critical aspect of settlement evaluation." Montrose, 50 F.3d at 748.[24]
*619 Although this standard may seem amorphous, as this opinion will show, fairness *307 and reasonableness "have more than a superficial meaning." Telluride, 849 F.Supp. at 1402. In many ways, fairness concerns the interactions among parties (settlers, non-settlers, and trustees) and the methods trustees use to (1) calculate total damages; (2) apportion liability; and (3) calculate the amount each settler pays. Public interest and consistency with the governing statute concern whether the settlement is an appropriate mechanism for accomplishing environmental cleanup. Reasonableness links fairness with these two concepts by comparing the total recovery with the total damages estimate. Under this prong, courts examine whether the settlement amount appropriately reflects litigation risks and is a large enough sum to further the statute's goals and the public interest.
* * *
The court's review of the relevant New Jersey caselaw concerning settlements shows that New Jersey courts generally review settlements to ensure fairness, reasonableness, consistency with the governing statute, and public interest, the same assurances federal courts look for when reviewing CERCLA consent decrees. For instance, when reviewing DEP settlements under the Freshwater Wetlands Protection Act ("FWPA"), N.J.S.A. 13:9B-1 to -30, New Jersey courts ensure that settlements are not "unreasonable or inconsistent with the policies underlying the FWPA." Ocean Cty. Chapter Inc. of Izaak Walton League of Am. v. N.J. Dep't of Envtl. Prot., 303 N.J. Super. 1, 11, 696 A.2d 25 (App. Div. 1997). Under Ocean County, courts are also to establish that "the procedures which the DEP follow[s] in entering into the settlement *620 ... [are not] unfair," id. at 12, 696 A.2d 25, and can approve a settlement with less than a full record, just as under CERCLA. Compare id. at 9, 696 A.2d 25 ("We also conclude that appellant failed to show ... that there is a need for a remand to develop a complete record supporting the settlement."), with Cannons, 899 F.2d at 88 ("Yet, it would disserve a principal end of the statute-achievement of prompt settlement and a concomitant head start on response activities-to leave matters in limbo until more precise information is amassed."). Furthermore, when reviewing Mount Laurel settlements,[25] courts make sure they are "fair and reasonable" and "adequately protect[ ] the interests of the persons on whose behalf the action was brought." Morris Cty. Fair Hous. Council v. Boonton Twp., 197 N.J. Super. 359, 370, 484 A.2d 1302 (App. Div. 1984) (citing Armstrong v. Milwaukee Bd. of Sch. Dirs., 616 F.2d 305, 314-15 (7th Cir. 1980) ; Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977) ).[26] This standard of review is appropriate because it allows for enough deference to balance New Jersey's strong public policy favoring settlements, Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143 (1990) ; Ocean Cty., 303 N.J. Super. at 10, 696 A.2d 25, with the need to protect settling parties and the public interest. Additionally, this standard recognizes that like the EPA, the DEP has been charged by the Legislature with the duty of "facilitat[ing] and coordinat[ing] activities and functions designed to clean up contaminated sites in the State." N.J.S.A. 58:10-23.11a ; see also *308 In re Stream Encroachment Permit, Permit No. 0200-04-0002.1 FHA, 402 N.J. Super. 587, 596, 955 A.2d 964 (App. Div. 2008) ("The NJDEP is authorized to 'formulate comprehensive policies for the conservation of the natural resources of the State, the promotion of environmental protection and the *621 prevention of pollution of the environment of the State.' " (citing N.J.S.A. 13:1D-9 ) ).
Despite their general agreement that the court should apply the CERCLA standard,[27] at times, the DEP and Exxon have urged this court to apply even more deferential standards. For instance, the DEP has argued that:
The Spill Act was enacted before CERCLA, against a state law backdrop in which New Jersey courts long have been instructed to uphold governmental lawsuit settlements "absent clear and convincing evidence of fraud or other compelling circumstances." Ocean Cty. Chapter Inc. v. N.J. Dep't of Envtl. Prot., 303 N.J. Super. 1, 12, 696 A.2d 25 (App. Div. 1997). The Legislature never indicated, either upon enactment of, or any amendment to, the Spill Act, that a more probing review applies to Spill Act settlements.
This is not an inaccurate assertion, but it comes from Ocean County, the same case that held that FWPA settlements must be fair, reasonable, and consistent with the policies underlying the FWPA. The court finds that the DEP's "fraud" argument is best understood as a component of a settlement's "fairness," for if settlement negotiations are premised on fraud, they cannot be considered fair.
Likewise, Exxon has argued that, "The Spill Act does not, however, expressly provide the standard for such judicial approval, and there is no New Jersey caselaw squarely on point. New Jersey law nonetheless sets forth a clear standard for the review of agency action pursuant to statutory mandate." Exxon asserts that "agency decisions 'will generally be upheld so long as they advance the agency's purpose and function,' " and that courts "may reverse an agency decision if it is arbitrary, capricious, or unreasonable." Further, they contend that agency decisions should only be disturbed if they are "patently corrupt, arbitrary or illegal."
Again, these considerations have their place in the standard, but they are not the be-all and end-all for Spill Act settlements.
*622 Although Exxon is correct that DEP decisions will only be reversed if they are "arbitrary, capricious, or unreasonable," In re Stream Encroachment Permit, 402 N.J. Super. at 597, 955 A.2d 964 (citations omitted), the DEP has "no superior ability to resolve purely legal questions," such as whether the Proposed Consent Judgment is fair, reasonable, and in the public interest. Greenwood v. State Police Training Ctr., 127 N.J. 500, 513, 606 A.2d 336 (1992) (emphasis added). When reviewing CERCLA settlements, federal courts, however, apply the arbitrary and capricious standard to a number of settlement components and trustee decisions made in order to formulate these components. Federal trustee decisions that are reviewed under the arbitrary and capricious standard include (1) estimation of total damages, In re MTBE, 33 F.Supp.3d at 265 ; (2) the chosen measure of comparative fault and apportionment of liability, Cannons, 899 F.2d at 87 ; and (3) the chosen method of determining the total projected costs to be paid by each settler. In re MTBE, 33 F.Supp.3d at 268-70. In other *309 words, the inputs (trustees' calculations and methods) used to produce the final consent decree are reviewed under arbitrary and capricious, while the output (the consent decree itself) is reviewed for fairness, reasonableness, faithfulness to the objectives of the governing statute, and public interest.
In conclusion, the court finds that CERCLA's settlement review standard is harmonious with general New Jersey settlement law. It therefore adopts this standard for Spill Act settlements. In the following subsections, the court will review the Proposed Consent Judgment for fairness, reasonableness, consistency with the Spill Act's objectives and intent, and public interest. During its review, when the court encounters technical decisions made by the DEP, it reviews them under the arbitrary and capricious standard.
III.A. Fairness
III.A.1 Procedural Fairness
"[F]airness in the CERCLA settlement context has both procedural and substantive components."
*623 Cannons, 899 F.2d at 86 (citing United States v. Cannons Eng'g Corp., 720 F.Supp. 1027, 1039-40 (D. Mass. 1989) ). "To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." Ibid. (citing Cannons, 720 F.Supp. at 1040 ; Rohm & Haas, 721 F.Supp. at 680-81 ; Kelley v. Thomas Solvent Co., 717 F.Supp. 507, 517-18 (W.D. Mich. 1989) ; Acushnet River, 712 F.Supp. at 1031 ; City of New York v. Exxon Corp., 697 F.Supp. 677, 693 (S.D.N.Y. 1988) ; New York v. Town of Oyster Bay, 696 F.Supp. 841, 844-45 (E.D.N.Y. 1988) ; United States v. Hooker Chems. & Plastics Corp., 540 F.Supp. 1067, 1080 (W.D.N.Y. 1982) ). Negotiations must be "conducted at arm's length," Tutu Water Wells, 326 F.3d at 206, and the parties must act "forthrightly and in good faith." Cannons, 899 F.2d at 86.
In determining whether the government entered into the decree in good faith, courts examine the "willingness of [the trustee] to thoroughly consider all oral and written comments made with regard to the proposed decree." Akzo, 949 F.2d at 1435. When governments supply the court and commenters with additional technical information, this is evidence of good faith and fairness. See Nucor Corp., 825 F.Supp. at 1459 (discussing substantive fairness). On the other hand, if the government's reaction to unfavorable comments is "to dismiss them as unfounded," this evinces a lack of good faith. Telluride, 849 F.Supp. at 1406.
The court finds that the Proposed Consent Judgment is procedurally fair. The record shows that the negotiations between two highly sophisticated parties with sharply conflicting interests were full of adversarial vigor. Cannons, 899 F.2d at 84, 87 n.4. Further, the parties were on equal footing, and the process was open and candid. Id. at 86. Finally, the DEP provided numerous substantive responses to the Public Comments and supplied the court and commenters with additional information after digesting them. Even though Amici do not seriously question the Consent Judgment's procedural fairness, a review of the negotiating process *624 is helpful to understanding other aspects of its fairness and reasonableness.
Amici contend that the State's decision to settle for $225 million, an amount they consider "suspiciously low," was an abrupt change of course. This is not the case, as settlement negotiations began under the Corzine Administration, as far back as 2007. In 2008, during mediation conducted by retired Associate Justice Daniel *310 O'Hern,[28] the State proposed a settlement whereby Exxon Mobil would pay $95 million to the State, $55 million in attorneys' fees and costs to the State's outside counsel, and perform off-site remedial projects which the State valued at approximately $400 million. Exxon immediately rebuffed this proposal, and Justice O'Hern concluded that further negotiations at that time would be useless. Although the total dollar figure on this proposal was $550 million, the Corzine Administration had performed an internal valuation of the package that, due to the effect of the pretrial special counsel retainer agreement, valued the whole package at $350 million. Negotiations did not resume until early 2012.
Later that year, after the State made a settlement demand of $325 million, Exxon countered with an offer of only $20 million. The parties were still far apart. At this time, the State adopted a strategy under which they believed the only way to force Exxon "into a reasonable settlement posture" was to aggressively push their case at trial. This gambit bore fruit, as negotiations reopened late in the trial.
For the first time, Exxon offered a substantial sum of money to settle the case: $100 million. This time, however, it was the State, emboldened by its effort at trial and believing that this sum was inadequate, that took a hardline approach and rejected the offer. Post-trial, negotiations continued in a "protracted and arduous"
*625 fashion until "the parties arrived at a figure that exceeded what the State had considered to be fair and reasonable:" $225 million, in addition to maintaining Exxon's duty to continue to clean up and remediate the sites under the ACOs.[29]
The State proceeded under two different governors and numerous DEP commissioners to attempt to settle this case for a guaranteed sum of money, rather than leaving it to the uncertainties of trial. For seven years, Exxon repeatedly responded to the State's olive branches with only token offers. An aggressive trial strategy is often the only way to bring reluctant parties to the table, and the State employed this tactic with success. The February 2015 agreement was not made on a whim, but was the end product of lengthy negotiations and zealous advocacy at trial.
Furthermore, Amici's contention that the State's inclusion of the Attachment C Facilities and Retail Gas Stations was done without consideration of the facts is also without merit. As General Hoffman made clear, during the 2012 negotiations, "the notion of a global settlement resolution was discussed." In that year, these additional sites were analyzed, and that analysis "was consistent with the de minimis value that is accorded those initial sites in the [Proposed Consent Judgment]." The State has known the limited value of these sites for years now, and, contrary to Amici's contention, the justifications and valuations of these sites laid out in the DEP Response to Public Comments were not post-hoc rationalizations.
The court also finds that the DEP Response to Public Comments evinces the fact that the Consent Judgment was entered into in good faith. Released July 9, 2015, this document contains a nine-page *311 introduction, twenty-two pages of substantive comments/responses, and a lengthy attachment listing all Exxon Retail *626 Gas Stations located in New Jersey. The DEP provided numerous, substantive responses to the public's comments and concerns on the Consent Judgment's (1) Surface Water Claims provision; (2) Morses Creek deferral; (3) grant of contribution protection to Exxon; (4) denial of liability provision; (5) adequacy of recovery; (6) inclusion of the Attachment C Facilities and Retail Gas Stations; (7) reaffirmation of Exxon's ACO duties; (8) lack of a provision mandating that the entire $225 million be used for environmental purposes; (9) the amount of money the State will spend in attorneys' fees; and (10) tax issues.[30] In response to calls for more complete information, when the State formally notified the court that it was seeking approval of the Proposed Consent Judgment on July 9, 2015, it provided additional certifications on the negotiation process and inclusion of the additional facilities. Furthermore, the DEP opened its Attachment C Facility files to the public and did not oppose the Environmental Groups' and Senator Lesniak's amicus applications.
The court gives no weight to two of Amici's final critiques of the Consent Judgment's procedural fairness. Senator Lesniak contends that because the Attorney General and DEP Commissioner issued press releases praising the Consent Judgment when it was first announced to the public, this shows "that they were firmly committed to the settlement" even before considering the Public Comments. The court is uncertain what the Senator expected the Attorney General and Commissioner to say in their press releases. Viewed against the backdrop of eight years of settlement negotiations where Exxon's initial position was $0, the State saw the settlement as a victory.
In a similar vein, the Environmental Groups fault the DEP for maintaining in its post-trial brief that it proved $8.9 billion worth of damages and asserting that Exxon's defenses were weak. Again, the court is at a loss for what the Environmental Groups expected the DEP to argue in its post-trial briefs. Although the *627 trial influenced settlement negotiations, the two events were traveling on parallel paths. The DEP was all too aware that over the past seven years, negotiations had repeatedly broken down. It makes perfect sense that the DEP would attempt to lock in a certain sum of money through settlement, while maintaining their trial arguments in the event negotiations collapsed.
In conclusion, the court finds that the Proposed Consent Judgment is procedurally fair. It was the product of arm's length, adversarial negotiations between two highly motivated, sophisticated parties. Moreover, the DEP demonstrated good faith with their Responses to Public Comments and allowance of Amici to submit briefs and argue orally.
III.A.2. Substantive Fairness
While the procedural fairness inquiry examines the process, the substantive fairness inquiry examines the output of that process. "Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the total cost of the harm for which it is legally responsible." Cannons, 899 F.2d at 87 (citing Developments in the Law-Toxic Waste Litigation, 99 Harv. L. Rev. 1458, 1477 (1986) ). These concepts dictate that "settlement terms must be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling *312 parties according to rational (if necessarily imprecise) estimates of how much harm each PRP has done." Ibid. (citing Rohm & Haas, 721 F.Supp. at 685 ; Cannons, 720 F.Supp. at 1043 ; Kelley, 717 F.Supp. at 517 ; United States v. Conservation Chem. Co., 628 F.Supp. 391, 401 (W.D. Mo. 1985) ). "As long as the measure of comparative fault on which the settlement terms are based is not 'arbitrary, capricious, and devoid of a rational basis,' the district court should uphold it." United States v. Se. Pa. Transp. Auth., 235 F.3d 817, 824 (3d Cir. 2000) (quoting Cannons, 899 F.2d at 87 ).
Likewise, a trustee's calculation of total damages must not be arbitrary, capricious, and unreasonable. In re MTBE, 33 F.Supp.3d at 265. "In addition, the ultimate measure of accountability *628 'is the extent of the overall recovery, not the amount of money paid by any individual defendant.' " United States v. Davis, 261 F.3d 1, 25 (1st Cir. 2001) (quoting Charles George, 34 F.3d at 1086 ).[31] Finally, to account for the fact that precise data is often unavailable, "particularly in the early phases of environmental litigation," Cannons, 899 F.2d at 88, a trial court's "finding of procedural fairness may also be an acceptable proxy for substantive fairness, when other circumstantial indicia of fairness are present." Davis, 261 F.3d at 23 (citing Charles George, 34 F.3d at 1089 ); see also Cannons, 899 F.2d at 87 n.4 ("To the extent that the process was fair and full of 'adversarial vigor,' Exxon, 697 F.Supp. at 693, the results come before the court with a much greater assurance of substantive fairness.").
Due to the high level of procedural fairness, the Proposed Consent Judgment comes before the court with strong indicia of substantive fairness. The court finds, however, that even without these indicia, the Consent Judgment is substantively fair on its own merits. This section continues by examining the DEP's method of calculating total damages, method of calculating an adequate sum paid by Exxon, and decision to not bring suits for fifteen of the Attachment C Facilities and Retail Gas Stations. Because these are the types of decisions well within the DEP's area of technical expertise and statutorily delegated duties, the court, as *629 stated above, will review them under the arbitrary and capricious standard.
III.A.2.a. The DEP's Total Damages Estimates
Amici do not contest the substantive fairness of the DEP's total damages estimate for Bayway and Bayonne. In fact, if Amici had things their way, this is the amount of money that Exxon would pay for damages to these sites. This estimate, $8.9 billion, was calculated by Lipton's Stratus Consulting after conducting a natural resource damage assessment at the sites. The court does not pass judgment on *313 the accurateness of this figure, but it finds that the DEP's decisions to retain Stratus and accept its assessment of the sites were well within its discretion and not arbitrary and capricious. Amici, however, fiercely contest the DEP's total damages estimates for the Attachment C Facilities and Retail Gas Stations.
The court finds that these estimates are also substantively fair. Of the sixteen Attachment C Facilities, only one is part of a pending suit: the former Paulsboro Terminal # 3045 ("Paulsboro"). The DEP initiated this suit in 2007 against Exxon and two other larger-fault defendants. Based on an expert report and NRDA, the DEP initially estimated total damages at $84 million: $81 million for primary restoration and $3.4 million for compensatory restoration. In 2011, the DEP settled with the non-Exxon defendants for $1.1 million, a settlement that the Honorable Anne McDonnell, J.S.C., approved. This payment was for post-1989 damages, the year Exxon stopped operating the facility. After this settlement, the DEP's experts re-examined the data to determine the pre-1989 damages attributable to Exxon and estimated these damages at $12.4 million for primary restoration and $1.4-$3.2 million for compensatory restoration. The court finds that the method used to estimate total damages at Paulsboro, the employment of specialized experts to conduct a formal NRDA, is much like the method it has determined is substantively fair for the Bayway/Bayonne estimation. The DEP's initial and post-2011 estimates were plausible and rational.
*630 Review of the DEP's total damages estimate for the other fifteen Attachment C Facilities presents more of a challenge for the court because NRDAs have not been completed for the sites. However, the court is mindful of the fact that because "a muddled record is the norm," formally completed NRDAs are the rare exception in CERCLA and Spill Act NRD settlements. See Charles George, 34 F.3d at 1088 (citing Cannons, 899 F.2d at 88 ; Lynnette Boomgaarden & Charles Breer, Surveying the Superfund Settlement Dilemma, 27 Land & Water L. Rev. 83, 121 (1992) ; Barry S. Neuman, No Way Out? The Plight of the Superfund Nonsettlor, 20 Envtl. L. Rep. 10,295, 10,299 (July 1990) ). The court agrees that in these situations, trustees must be given flexibility and that trial courts "should give the [DEP]'s expertise the benefit of the doubt when weighing substantive fairness." Cannons, 899 F.2d at 88 ; see also Charles George, 34 F.3d at 1088 (citations omitted).
Applying these principles to the DEP's total damages estimate for the fifteen other Attachment C Facilities, the court finds that this estimate is not arbitrary and capricious and is supported by substantial, credible evidence. Exxon has remediation obligations for all these Facilities, but the DEP has no plans to bring NRD suits for any of them. This is because the contamination is so insubstantial, that none of the sites have "groundwater or other contamination that would make it cost effective for [Commissioner Martin] to recommend that suit be filed."
The court has examined the following evidence of contamination and injury at these sites. First, attached to Commissioner Martin's Certification in Support of the Consent Judgment are sixteen certifications from his professional staff describing the size of groundwater plumes at each site. With the exception of three plumes that are sixteen, twenty, and twenty-five acres large, all plumes are less than five acres in size. In fact, half are less than two acres in size. Second, Commissioner Martin's certification laid out six factors that his staff evaluated to determine what they *314 would expect to claim as NRD: (1) the location of the site; (2) *631 whether the site is in a water supply deficit or surplus area; (3) what water supply planning area the site is in; (4) the size of the classification exemption area ("CEA") (which indicated how much groundwater may not be used due to possible contamination); (5) the duration of the injury; and (6) the water recharge rate. Based on these factors, the DEP estimated total damages for these fifteen Attachment C Facilities at $4 million.[32] According to Commissioner Martin, this recovery "compares favorably to ... prior similar settlements." Finally, the court has weighed General Hoffman's statements made during oral argument. Responding to an Amici assertion that the DEP's evaluation and valuation of these sites was done after the Public Comment Period ended, he clarified that "valuation was done in [20]12, that was similar to the valuation that was done every year before the information came in, was that these sites are not worth the litigation costs." Based on this information, the court cannot say the DEP's valuation was "willful and unreasoning ... without consideration and in disregard of circumstances." New Jersey v. Gloucester Envtl. Mgmt. Servs., Inc., 591 F.Supp.2d 744, 753 (D.N.J. 2008) (quoting In re Proposed Xanadu Redevelopment Project, 402 N.J. Super. 607, 642, 955 A.2d 976 (App. Div. 2008) ).
Amici point out that some of the sixteen staff certifications admit that some groundwater studies are not 100% complete and that there exists contamination other than just groundwater. For these reasons, they have sought to intervene in this case in order to conduct supplemental site investigations and get additional discovery. Whatever their motives, the caselaw makes clear that when the DEP has performed a rational analysis after reviewing the evidence, such detailed investigations are not required for this court to approve the Consent Judgment. For example, in Arizona ex rel. Woods v. Nucor Corp., two public commenters urged the *632 U.S. District Court for the District of Arizona to reject a settlement because a remedial investigation and feasibility study ("RI/FS") had not been formally completed. 825 F.Supp. at 1462. Rejecting this argument, the court reasoned, "Completion of an RI/FS undoubtedly would reduce the uncertainty regarding the total clean up cost at the Study Area and possibly reduce uncertainty regarding the proportional fault of the PRPs. Uncertainty, however, is inevitable even with an RI/FS." Id. at 1463. Both the Spill Act and CERCLA seek to achieve early settlements in order to expedite remediation and restoration, and were this court to accept Amici's argument, it "conceivably could preclude all agreements, a result contrary to [the Spill Act's] objective." See ibid. The DEP is aware of the contamination, groundwater and otherwise, at the Attachment C Facilities, and has applied their technical expertise in a rational fashion, and reached a total damages dollar figure. The caselaw and practical realities of a limited budget require no more.
Applying these same principles to the DEP's total damages estimate for the 1768 Retail Gas Stations, the court reaches the same conclusion. Since 2007, many of these retail stations have been part of *315 New Jersey Department of Environmental Protection v. Atlantic Richfield Co. (In re Methyl Tertiary Butyl Ether "MTBE" Products Liability Litigation), the MTBE litigation in the Southern District of New York.[33] To be clear, as with the Attachment C Facilities, the Proposed Consent Judgment releases Exxon for only non-MTBE NRD at these stations. Of these 1768 retail stations, 716 have had discharges of MTBE and are the subject of the In re MTBE litigation.
As with the fifteen non-Paulsboro Attachment C Facilities, the DEP has known about non-MTBE NRD at these stations for years and has consistently concluded that these stations are not worth litigating. During settlement negotiations, however, Commissioner *633 Martin's staff reexamined their records to be sure. Specifically, this effort checked which of the remaining 1052 sites have CEAs that "would indicate ground water contamination that requires non-use of the ground water for potable purposes." This review identified only thirty sites, with plume sizes ranging "from .02 acres, to just over seven acres." Running these thirty sites through the six factor algorithm that it used for the Attachment C Facilities, the DEP concluded that the total monetary damages estimate for the Retail Gas Stations was "nominal." Again, the court's task is always easier when formal NRDAs have been completed for sites being settled. However, no court or state requires the completion of a formal NRDA and attachment of a precise dollar figure to each settlement site. Through the administrative settlement process, the DEP has developed the CEA threshold system and applied the six damage estimate factors in a reliable fashion for years now. Importantly, although the DEP has not quantified damages with mathematical exactness for the Attachment C Facilities and Retail Gas Stations, qualitative methods, such as the CEA threshold analysis and six factored damage estimate analysis suffice.
In response to the DEP's total damages estimates, Amici rely on the aforementioned In re MTBE. This case, however, is distinguishable from the DEP's estimates. In addition Amici have relied on Mathes v. Century Alumina Co., an unpublished opinion that lacks precedential value. The district court initially rejected the In re MTBE settlement between the DEP and Citgo Petroleum Corporation for a number of reasons. First, the DEP had formulated a list of 498 sites that contained MTBE above 700 parts per billion. In re MTBE, 33 F.Supp.3d at 263. The DEP then multiplied 498 by $4,657,608 (the average cost of restoration at ten DEP selected sites) to reach a portion of their total damages estimate. Ibid. The district court took issue with this procedure because a review of the 498 sites on the list showed that seven of the ten DEP selected sites were excluded from the list and it included at least one site where the DEP's experts conducted no discovery. Id. at 268. Second, the district court took issue with the *634 fact that for 4547 other sites, the DEP arbitrarily attributed a $50,000 damages tag to each of these sites. Ibid. The DEP provided no explanation for how it reached this $50,000 figure. Ibid. However, in the present case, the DEP has provided a rational explanation for its total damages estimates, unlike for its In re MTBE estimate.
This court is satisfied that the DEP has provided acceptable total damages estimates for all four of the above-discussed areas: (1) $8.9 billion for Bayway and Bayonne; (2) between $13.8 million and $15.6 million for Paulsboro; (3) $4 million for the fifteen other Attachment C Facilities; and (4) nominal for the Retail Gas Stations.
*316 As a final argument against the substantive fairness of the total damages estimate for the retail stations, Amici contest that the DEP has not made their files available to the public for these sites, in contrast to its decision to open up its files for the Attachment C Facilities. There is a perfectly reasonable explanation for this seeming discrepancy. A number of the retail stations are part of ongoing In re MTBE litigation. Many of these files contain privileged information and estimates for these stations, and it makes sense that the DEP would not want to hand over analyses and strategies that their adversaries could use against them in other lawsuits. See United States v. BP Exploration & Oil Co., 167 F.Supp.2d 1045, 1052 (N.D. Ind. 2001) ("The Government is under 'no obligation to telegraph its settlement offers, divulge its negotiating strategy in advance, or surrender the normal prerogatives of strategic flexibility which any negotiator cherishes.' ") (quoting Cannons, 899 F.2d at 93 ).
III.A.2.b The DEP's Methods of Calculating an Adequate Settlement Sum
The court finds that the DEP's methods for calculating the amount to be paid by Exxon for Bayway/Bayonne, Paulsboro, the fifteen other Attachment C Facilities, and the Retail Gas Stations are supported by a rational basis and not arbitrary and capricious. Tutu Water Wells, 326 F.3d at 207. During the 2012 *635 negotiations, then Executive Assistant Attorney General Hoffman established a benchmark for the State's settlement demand. He did this by analyzing comparable NRD settlements[34] and determining what the State's average compensation was for an acre of contaminated wetlands. In consultation with the DEP, he determined that the average per-acre recovery was $83,770. Had the State recovered this amount per-acre for Bayway/Bayonne, Exxon's payment for these sites would have only been approximately $159 million.
As $220 million of the total $225 million from the Proposed Consent Judgment is for the Bayway/Bayonne recovery, this means the State beat its historical average by $61 million. For four reasons, this method was a rational process for determining how much Exxon should pay for the injuries it has allegedly caused. First, determining a per-acre recovery amount for injured wetlands falls squarely within the DEP's technical expertise. Second, the $83,770 figure was calculated based on past settlements that were determined, either administratively or judicially, to be fair, reasonable, and in the public interest. This means that both state regulators and jurists alike considered this per-acre recovery to be substantively fair. Third, all of these prior settlements were published and put out for public comments. According to General Hoffman, "Nobody ever contested that they were not fair and reasonable settlements." Finally, three of the four settlements off which this $83,770 figure is based were conducted jointly with federal trustees. The federal government conducted their own cross-check of these amounts and determined that they were fair and reasonable. Using this number as a benchmark, and then beating it by almost 40%, is a highly rational method for determining the amount Exxon should pay for their discharges at Bayway and Bayonne.
*636 The DEP's method for calculating the amount paid by Exxon for injuries at *317 Paulsboro also was not arbitrary and capricious. As discussed above in the "Total Damages" Section, the State settled with two of the three Paulsboro defendants for $1.1 million out of their estimated $68.1-$70.8 million in damages. Again, no one contested through the public comments this roughly 1.6% recovery by the State. When the State reviewed these numbers and settled Exxon's $13.4-$15.6 million total damages share for $1 million, this was a rational decision. There is nothing substantively improper with the DEP's decision to use this as a benchmark and then recover a far larger percentage, on top of Exxon's Paulsboro remediation obligations.
The DEP's method of determining the amount paid by Exxon for contamination at the fifteen other Attachment C Facilities and Retail Gas Stations is also rational. As discussed above, for these two groups of sites, the DEP analyzed CEAs and the six damage factors. For the fifteen remaining Attachment C Facilities, the DEP recovery is $2.6 million. This 65% recovery of the $4 million estimate (2.6/4.0) is per se fair and reasonable.
In an effort to draw a parallel to In re MTBE, Amici have attempted to paint the DEP's explanation for recovery at these fifteen sites as "inconsistent." 33 F.Supp.3d at 268 (rejecting DEP settlement with Citgo because, inter alia, the DEP's list of 498 sites contained inconsistencies). The Environmental Groups assert:
The Department's defense of the Settlement's natural resources damage releases for the other fifteen Attachment C sites is similarly incomplete and self-contradictory. Although the Department ascribes a value to these sites, the sum varies from document to document. Commissioner Martin says he valued them at $2.6 million. Supra Pt. III.A. (citing Martin Cert. ¶¶ 24, 32-33). In its public-comment response, the Department says it valued them at about $4 million. Comment Response 14.
This contention results from their misreading and misunderstanding of Commissioner Martin's Certification and the DEP Response to Public Comments. In the Public Comment Response, the DEP states, "Based on the information in the DEP's site remediation files, the total value of NRD for the 15 sites other than Paulsboro was estimated to be approximately $4 million." In his certification, *637 Commissioner Martin states, "I allocated$2.6 million of the total settlement to the Appendix C portion of the settlement." The two numbers, $2.6 million and $4 million, are not inconsistent, but rather refer to different things.
Like the Attachment C Facilities, the DEP has no current plans, had no past plans, and has no future plans to bring NRD suits for the Retail Gas Stations. The costs of bringing these suits and performing NRDAs outweighs any potential recovery at these sites. Therefore, the fact that the DEP is recovering anything, let alone $1.4 million for non-MTBE NRD at these sites, is per se fair and reasonable and results in an unexpected recovery for the People of New Jersey.
III.A.2.c. The DEP's Decisions Not to Bring Suits for the Attachment C Facilities and Retail Gas Stations
The Legislature has vested the DEP with broad discretion to bring and settle NRD suits. Implicit in this power is the ability to decide when it is not proper to bring a lawsuit. In everyday life, people make cost/benefit decisions that lawsuits are an inefficient waste of time and resources compared to the potential recovery they would bring. The same is true for the DEP.
*318 To this point, the court has belabored this reality with citations to caselaw that make clear the fact that trustees can settle suits with far less than a full damages picture. Routinely, district courts reject objectors' calls for full evidentiary hearings. Rohm & Haas, 721 F.Supp. at 686-87 (citing Acushnet River, 712 F.Supp. at 1031 n.21 ; Exxon, 697 F.Supp. at 691 ; Kelley, 717 F.Supp. at 507 ). The DEP has demonstrated that the fifteen Attachment C Facilities and Retail Gas Stations have nominal potential NRD claims. They have applied reasoned, if imprecise, methods to determine these sites' values. For two additional reasons, their decisions not to bring these suits is rational.
First, Exxon and the State have differing views on the statute of limitations' application to these sites. Exxon contends that the statute has run, but the State contends that the statute does not run until remediation is completed at the sites. Litigation over the *638 proper application of the statute would only add to the time and expense of these suits and would further dilute any potential recovery.
Second, 716 of the 1768 Retail Gas Stations have discharges of MTBE at the sites and are part of the Southern District of New York litigation. This means that if the DEP did not include non-MTBE NRD claims in that suit, they would most likely be estopped from doing so in the future under the "entire controversy doctrine." McNeil v. Legislative Apportionment Comm'n, 177 N.J. 364, 395, 828 A.2d 840 (2003). This concern, together with the potential statute of limitations issue, makes it all the more clear that any recovery on non-MTBE claims is an unexpected gain. With these potential claims now settled, the DEP has extra time and resources to pursue the In re MTBE claims and other MTBE claims at the Attachment C Facilities, claims the DEP believes are substantial.
Contrary to Amici's wishes, the court will not penalize the DEP for properly exercising its discretion, especially when both the Appellate Division and Supreme Court have recognized that the DEP must perform this task "in the context of complex environmental cleanups and a finite source of cleanup funds." Exxon I, 393 N.J. Super. at 400, 923 A.2d 345 (quoting Marsh v. N.J. Dep't of Envtl. Prot., 152 N.J. 137, 144, 703 A.2d 927 (1997) ). At the conclusion of the Bayway/Bayonne Trial, the State submitted costs of $1,199,537.23 for expert witnesses. These costs are included in its outside counsel's fee and cost application of $50,096,966.34. By any standard, these are large amounts of money. The State has substantial expertise in environmental cost/benefit analysis and has weighed the prospect of such future costs against the benefits of litigating these minor cases. Because they have done this analysis, the court will not make them litigate to attain such Pyrrhic victories when settlement is a less costly and more effective option. See Exxon, 697 F.Supp. at 693 ("Nonetheless, the settling companies are willing to settle because of the inherent risks of continued litigation, and because a 'victory' after protracted *639 litigation may prove to be more expensive than settlement."); Plutarch, Lives of the Noble Grecians and Romans 483 (John Dryden trans., The Modern Library rev. ed. 1864) (c. 120 A.D.) ("The armies separated; and it is said, Pyrrhus replied to one that gave him joy of his victory that one other such would utterly undo him.").
* * *
In conclusion, the court finds that the Proposed Consent Judgment is substantively fair. The following DEP estimates and decisions all pass the arbitrary and *319 capricious standard used to review agency action: (1) the estimate of total damages for Bayway and Bayonne, the Attachment C Facilities, and the Retail Gas Stations; (2) the calculation of adequacy of the amount paid by Exxon for each of these three areas; and (3) the DEP's decision not to file NRD suits for fifteen of the Attachment C Facilities and the Retail Gas Stations.
It bears noting that if the substantive fairness prong did not seem like a difficult hurdle for the Proposed Consent Judgment to jump, this is due to the nature of this settlement. Practically every CERCLA settlement opinion this court has reviewed, whether by a district or circuit court, discussed fairness in the context of a multi-defendant lawsuit. Those courts were mainly concerned with fairness vis-à-vis settling and non-settling defendants or with fairness between non-settlers and the trustee. The typical settlement dispute involves a non-settling defendant objecting to the trustee's liability allocation system or method of calculating total damages and arguing that it in some way prejudices them. But see generally Acushnet River, 712 F.Supp. 1019 (discussing both non-settler and intervening interest group objections).
Because Exxon and the State voluntarily entered into the Proposed Consent Judgment after highly contested negotiations and now simultaneously urge this court to approve it, there is less of a reason for this court to police substantive fairness. Charles George, 34 F.3d at 1088 ("There is little need for a court to police *640 the substantive fairness of a settlement as among settling parties of a particular class. Sophisticated actors know how to protect their own interests, and they are well equipped to evaluate risks and rewards."). The public's interest in this suit and their concern over the perceived inadequacy of the recovery amount, however, begin to come into sharper focus in the next section. There, the reasonableness inquiry shifts the court's attention from fairness among the parties to whether the Consent Judgment adequately compensates the public for harm to its natural resources.
III.B. Reasonableness
There are three facets to a consent decree's reasonableness. First, the "decree's likely efficaciousness as a vehicle for cleansing the environment is of cardinal importance." Cannons, 899 F.2d at 89 (citing Cannons, 720 F.Supp. at 1038 ; Conservation Chem., 628 F.Supp. at 402 ; United States v. Seymour Recycling Corp., 554 F.Supp. 1334, 1339 (S.D. Ind. 1982) ). The second facet "will depend upon whether the settlement satisfactorily compensates the public for the actual (and anticipated) costs of remedial and response measures." Id. at 90. The third factor concerns the relative strength of the parties' litigating positions and litigation risks. Ibid. Bearing this third facet in mind, in conjunction with the fairness and fidelity to the statute prongs, the proper way to gauge the adequacy of the settlement is "to compare the proportion of total projected costs to be paid by the settlors, with the proportion of liability attributable to them, and then to factor into the equation any reasonable discounts for litigation risks, time savings, and the like that may be justified." Charles George, 34 F.3d at 1087.
As the Bayway/Bayonne Litigation was a natural resource damages case, the first factor might not seem that relevant to the court's review of the Consent Judgment. This is because the first factor is "basically a question of technical adequacy, primarily concerned with the probable effectiveness of proposed remedial responses." Cannons, 899 F.2d at 89-90 (emphasis added). However, the Consent *320 Judgment importantly reaffirms Exxon's remedial *641 obligations at not only Bayway and Bayonne, but also for the Attachment C Facilities and Retail Gas Stations. In the Public Comments, there has been, unfortunately, a lack of understanding over the potential significance of this provision.
One of Exxon's trial arguments was that if the court awarded primary restoration damages, this should release Exxon from their ACO remediation obligations. The distinction between the two types of cleanups is key. "[R]emediation involves the cleanup of contaminants to 'risk-based' levels, whereas '[primary] restoration' and 'replacement' requires return of the natural resource to its pre-discharge condition ...." Exxon I, 393 N.J. Super. at 393, 923 A.2d 345. Primary restoration, therefore, is more all-encompassing than remediation because if a natural resource is returned to its pre-discharge condition, it is in a better state than if it had only been cleaned up to risk-based levels.
Exxon's argument, then, boils down to the fact that plaintiffs are not allowed a double recovery, and an award of primary restoration that maintains a defendant's remediation obligations could arguably be viewed as a double recovery. The court, in this decision, does not pass judgment on the merits of this argument. For present purposes, however, the fact that Exxon is paying compensatory NRD on top of the Consent Judgment's reaffirmation of their remediation obligations means that the Consent Judgment is technically adequate for cleaning up the environment.
Furthermore, the Consent Judgment is an appropriate vehicle for cleansing the environment because it places "the risks of future uncertainties upon [Exxon] rather than the government[ ]." Kramer, 19 F.Supp.2d at 288-89. Paragraph Sixteen of the Consent Judgment states:
The [State] shall retain full authority and sole discretion to require ExxonMobil to take any action, or arrange for action to be taken, to address an immediate environmental concern, an imminent and substantial endangerment to public health, welfare or the environment, or an emergency response arising from or related to the Bayonne Facility, the Bayway Facility, any of the ExxonMobil Retail Stations, and any of the sites listed in Attachment C.
*642 The U.S. District Court for the District of New Jersey has found a similar provision to be reasonable. Id. at 289. The first reasonableness factor, therefore, weighs in favor of approving the Consent Judgment.
The Consent Judgment also adequately compensates the public for injuries to natural resources. Adequacy of recovery is not "merely a function of how close a settlement comes to meeting an estimate of projected costs." Charles George, 34 F.3d at 1085. Were this the standard, many NRD settlements could not be considered reasonable due to the fact "that defendants will generally settle for substantially less-indeed, often for far less given the inherent problems of proof in these cases-than the asserted damages." See Acushnet River, 712 F.Supp. at 1032. Rather, reasonableness is a pragmatic concept that "requires common sense, practical wisdom, and a dispassionate assessment of the attendant circumstances." Ibid. Although much of the analysis for this second factor overlaps with the litigation risks factor, there are a few distinct points. Amici and the Public Commenters have continually argued that the State's $225 million recovery cannot be reasonable in light of the Stratus Report's $8.9 billion damages estimate. It is true that Judge Anzaldi found Exxon to be strictly liable and that Exxon did not file an interlocutory appeal challenging this ruling. Exxon *321 I, 393 N.J. Super. at 397-98, 923 A.2d 345. For two reasons, however, this finding of liability, together with the Stratus estimate, did not guarantee that the State was going to recover $8.9 billion at trial.
First, because Exxon reserved their right of appeal on the liability issue, they would have had the right to appeal the ruling to the Appellate Division and Supreme Court. This legal ruling would have been reviewed de novo, and if reversed, would have left the State with a $0 recovery. Second, assuming Exxon is in fact liable, they are only liable for those damages which the State can prove at trial. For any number of reasons, discussed more fully below, had the State not met the preponderance of evidence hurdle for certain areas of allegedly damaged habitats, it could not *643 have recovered damages for those areas. Although the Consent Judgment's perceived deep discount is only reasonable if justified by litigation risks, courts have held that the public can be adequately compensated when a trustee "only receives a portion of the remediation cost from a party previously adjudicated liable for the entire cost." Davis, 261 F.3d at 25-26 (citing United States v. Davis, 11 F.Supp.2d 183, 192 (D.R.I. 1998) ) (agreeing with district court).
The fact that the recovery amount far outpaces the State's previous wetlands settlement recoveries shows that the amount adequately compensates the public. Bearing in mind that the DEP is accorded deference on this determination, id. at 21, the fact that in the past, both federal trustees and other trial court judges have considered lower per-acre recovery sums to be reasonable underscores the reasonableness of the DEP's near 40% improvement over their historical average. Moreover, this recovery is adequate considering the litigation risks and real possibility that the State could have walked away from litigation with far less money, or none whatsoever.
Litigation risks can be broken down into trial risks and appellate risks. Trial risks encompass the possibility that this court would have accepted some or all of Exxon's legal contentions and found that the State did not meet their burden of proving injuries to natural resources or loss of natural resource services. Appellate risks encompass the appeals Exxon has made clear they would take from Judge Anzaldi's pre-trial rulings, this court's legal rulings and findings of fact made at trial, and Exxon I and Exxon II. Due to the method the State employed to calculate damages at Bayway and Bayonne, the court is in a unique position to weigh these risks in that it has the ability to estimate, in dollar amounts, the effect that various adverse rulings might have on the State's potential recovery.
As discussed above, the State, through Lipton and Stratus Consulting, used a HEA to quantify injuries at Bayway and Bayonne. Both trial and appellate risks have a direct impact on *644 the acceptability of the inputs to the HEA formula. At trial, over Exxon's objection, the court accepted as demonstratives two active Excel spreadsheets that Lipton created.[35] Although the State maintained that they proved all $8.9 billion in total damages, the purpose behind providing these demonstratives was to allow the court to reliably adjust downward the damages award if, for example, it determined that the State did not prove all of their damages. The result of this is that although Public Commenters and Amici can downplay how risks would affect the State's recovery in theory, the court can actually consider in dollar amounts how adverse rulings would negatively impact *322 the State's recovery.[36] The court finds that although a "reasonableness inquiry, like that of fairness, is a pragmatic one, not requiring precise calculations," United States v. Charter Int'l Oil Co., 83 F.3d 510, 521 (1st Cir. 1996) (emphasis added) (citing Charles George, 34 F.3d at 1085 ), nothing in the caselaw prohibits such calculations and estimates, especially when they would help the reader understand the court's decision.
Although not calculated by the HEA, which calculates compensatory damages, the State also sought a $2.5 billion award for on-site primary restoration. Under N.J.S.A. 58:10-23.11u(b)(4), the State has the burden of demonstrating, by a preponderance of the evidence, that any restoration plan is "practicable." This does not present much of a hurdle for compensatory restoration plans because the State can select sites that will easily accommodate restoration. The State, however, must take sites as it finds them when seeking to conduct primary restoration. This means that if certain site-specific realities make primary restoration non-practicable, the State may not conduct primary restoration. If this is the case, courts in turn cannot award primary restoration damages.
*645 In an effort to show that their primary restoration plan for Bayway and Bayonne was practicable, the State sought to introduce the expert engineering testimony of Randy Horsak and Ronald Ostermiller. For several days during trial, Exxon challenged these witnesses on cross-examination with numerous potential difficulties the State would encounter or failed to consider when seeking to restore natural resources at the Bayway and Bayonne sites. These realities included, but were not limited to, the estimated length of time to complete the work, the cost of the plan, the plan's highly conceptual nature, the fact that the plan would need approval and be monitored by many regulatory authorities, which the State had not considered, and the fact that Exxon no longer owns the sites. Exxon also countered with the expert testimony of Rodgers and other fact witnesses.
Again, it bears noting that the court never admitted Horsak's, Ostermiller's, or Rodgers' testimony into evidence. They all testified conditionally while the opposing sides' Rule 104 Motions were pending. In this opinion, the court does not pass judgment on their testimony or on the practicability of the State's primary restoration plan. However, if the court had found that the State did not meet its burden of proving practicability, the State would have recovered $0 for primary restoration damages, and its total potential recovery would have been reduced to $6.4 billion, a reduction of over 28%.
The next significant litigation risk concerns whether the Spill Act's NRD provision applies retroactively. In 2009, Judge Anzaldi held that the State could seek restoration damages for pre-1977 injuries, the year the Spill Act came into effect. Retroactivity Ruling, slip op. at 5. He based his Retroactivity Ruling on New JerseyDepartment of Environmental Protection v. Ventron Corp., 94 N.J. 473, 468 A.2d 150 (1983), in which the Supreme Court held that the Spill Act's remediation provision applies retroactively. This Retroactivity Ruling was the law-of-the-case, and had this matter concluded with the issuance of this court's opinion, this court would have felt obligated to follow it. The *323 restoration *646 damages retroactivity risk, however, is actually a dual trial and appellate risk, as well as a question of first impression under the Spill Act.
Although the court would have applied the Spill Act's NRD provision retroactively, it still had to interpret Judge Anzaldi's ruling to determine what "retroactivity" meant. In the normal sense, retroactive damages mean the defendant is liable for not only pre-Act damages, but also that they must pay money to compensate the State for the pre-Act years that the natural resource was injured. On the other hand, the court could have construed the Spill Act's NRD provision to reflect CERCLA's provision. Under CERCLA, "There shall be no [NRD] recovery ... where such damages and the release of a hazardous substance from which such damages resulted have occurred wholly before the enactment of this Act [enacted Dec. 11, 1980]." 42 U.S.C. § 9607(f)(1). Courts have interpreted this provision to mean that if damages occur before 1980, and the natural resources remain damaged after 1980, then trustees can only recover a monetary award from 1980 onwards. Either way this court ruled, its interpretation would have been reviewed on appeal, as well as Judge Anzaldi's Retroactivity Ruling. If these rulings were reversed, because most of the alleged injuries occurred before the Spill Act came into effect-some of which even allegedly occurred over a hundred years ago-the State's recovery would be nominal, if anything at all.
If the Spill Act's NRD provision was determined to be retroactive only to 1977, the year it came into effect, because one of the key HEA inputs was the "year damages begin to accrue," the effect on the State's potential recovery would be significant. Entering "1977" as the input into the Bayway and Bayonne HEA demonstratives and assuming no primary restoration, the maximum recovery for the State shrinks to $1.269 billion, a reduction of over 85% based on only two litigation risks.
The retroactivity risk does not end there, because even if this court interpreted Judge Anzaldi's Retroactivity Ruling to mean *647 full retroactivity, it still would have been obligated to perform "as-applied" takings and substantive due process analyses under the Fifth and Fourteenth Amendments to the U.S. Constitution. U.S. Const. amends. V, XIV. Even if the court, the Appellate Division, and the New Jersey Supreme Court found that retroactive application of the Spill Act's NRD provision did not violate Exxon's Fifth and/or Fourteenth Amendment rights, Exxon could appeal such rulings to the United States Supreme Court.
Under that Court's Fifth Amendment takings test, which has been incorporated against the states through the Fourteenth Amendment, if any of these four courts found that the economic impact of its award impermissibly interfered with Exxon's reasonable investment-backed expectations, such an award would constitute an impermissible taking without just compensation. Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). In fact, applying this test, a plurality of the Court has found that the retroactive application of the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act") constitutes a taking when it seeks to hold corporations liable for acts that occurred only thirty years before its passage. E. Enters. v. Apfel, 524 U.S. 498, 538, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (plurality opinion). In the instant case, the State was looking for damages back to 1877, a hundred years before the Spill Act came into effect.
Eastern Enterprises only commanded a plurality of the Court, but Justice Kennedy's *324 concurrence raised the specter of substantive due process invalidation of retroactive laws. Although he sharply criticized the plurality for their takings analysis, Justice Kennedy agreed with their ultimate conclusion: the Coal Act could not compel Eastern Enterprises to make health care payments for actions that occurred thirty years before the Act's enactment. E. Enters., 524 U.S. at 539, 118 S.Ct. 2131 (Kennedy, J., concurring in the judgment and dissenting in part). Importantly, he noted that the retroactive application of laws has been disfavored since before the founding of this country. Id. at 547, 118 S.Ct. 2131. *648 Finally, assuming the State proved damages back to 1877, the Spill Act's retroactive application to the Bayway and Bayonne sites could still have been invalidated under New Jersey courts' "manifest injustice test." Nobrega v. Edison Glen Assocs., 167 N.J. 520, 537, 545, 772 A.2d 368 (2001) (discussing this country's "long-standing belief" that retroactive laws are unjust and how the manifest injustice standard is broader than that afforded by the Constitution). If a court found either a takings, substantive due process, or manifest injustice violation, again, the State's maximum compensatory damages recovery would be reduced to $1.269 billion.
The next risk concerns the Spill Act's interplay with the Public Trust Doctrine. The Spill Act allows the State to seek recovery for injuries to natural resources, which it defines as "all land, fish, shellfish, wildlife, biota, air, waters and other such resources owned, managed, held in trust or otherwise controlled by the State." N.J.S.A. 58:10-23.11b (emphasis added). Because the entirety of Bayway and Bayonne is privately owned property, Exxon contends that the sites cannot be considered land that is owned, managed, or otherwise controlled by the State. Although they do not dispute that the State holds all surface water and groundwater in trust, they argue that courts' historical application of the Public Trust Doctrine negates the possibility that the State can recover damages for injuries to most of the upland soils and sediments at the sites. The New Jersey Supreme Court has defined the public trust as being "the land flowed by the tidal waters, which extend to the mean high water mark." Matthews v. Bay Head Improvement Ass'n, 95 N.J. 306, 312, 471 A.2d 355 (1984) (emphasis added). Because most of the land at Bayway and Bayonne is inland of the mean high water mark, Exxon contends that these lands are not natural resources, as defined under the Spill Act, for which the State can recover damages. Rejecting this assertion in his Public Trust Ruling, Judge Anzaldi held that "any lands which are contaminated as a result of actions by Exxon or its predecessors could be subject to damages under the Spill Act." Public Trust Ruling, slip op. at 4 (emphasis added).
*649 Judge Anzaldi's ruling would have constituted law-of-the-case, and this court would have applied it when formulating its opinion. As with the Retroactivity Ruling, and this court's interpretation of that ruling, the Appellate Division and Supreme Court would have reviewed this ruling de novo. Exxon contends, and the court agrees, that if either of these courts reversed, the maximum number of acres for which the State could seek damages, those lands flowed by the mean high water mark, would be approximately 150 to 200 acres of intertidal habitat. Under a 200-acre scenario, assuming no primary restoration and a 1977 start date, the State's maximum potential recovery would have been reduced to approximately $300 million.
Even if the Appellate Division and Supreme Court upheld the Public Trust Ruling *325 and allowed for full retroactivity, the uplands meadow cost estimation risk could have reduced the State's total potential recovery by $308,000,000. In order to establish the restoration cost per an acre of uplands meadow, the State retained Robert Williams. Although Exxon did not challenge his forestry and forest reforestation credentials, they contended that Williams lacks the requisite expertise in estimating the cost of forest restoration. If the court granted Exxon's Williams Rule 104 Motion and barred his testimony, even assuming the State demonstrated that Exxon injured all acres of uplands meadow for which the State was seeking damages, Lipton's HEA would not have had the necessary per-acre uplands meadow restoration cost input, which Williams estimated at $90,000. Therefore, the court would have been compelled to award $0 for uplands meadow injuries.
The one pre-trial ruling that Judge Anzaldi issued in Exxon's favor, his Physical Modification Ruling, was potentially the most significant trial risk for the State. That is because even if all of the above-mentioned risks were resolved in the State's favor, the physical modification risk had the potential to render these victories moot. Although the previously discussed risks were all purely legal issues, this risk involved the overlooked fact that the State still would have had to prove damages at trial.
*650 Under the Spill Act, the State can recover for natural resources that were "damaged or destroyed by a discharge" of a hazardous substance. N.J.S.A. 58:10-23.11u(b)(4) (emphasis added). A "discharge" is defined as:
[A]ny intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State, or into waters outside the jurisdiction of the State when damage may result to the lands, waters or natural resources within the jurisdiction of the State.
[ N.J.S.A. 58:10-23.11b.]
Because the State must prove by a preponderance of the evidence that a discharge of a hazardous substance injured a natural resource or impaired a natural resource service, see N.J.A.C. 7:26E-1.8 (defining "injury" under the Spill Act's regulations as "any adverse change or impact of a discharge on a natural resource or impairment of a natural resource service"), the State cannot recover damages under the Spill Act if something other than a discharge of a hazardous substance injures a resource or its services. For this reason, in his Physical Modification Ruling, Judge Anzaldi dismissed "the DEP's claims, under the Spill Act and the common law, for damages for injuries to natural resources of the State on the Bayway and Bayonne sites that are the result of physical modifications to the Bayway and Bayonne sites." Physical Modification Ruling, slip op. at 1.
Due to this ruling, this court's post-trial task interpreting Judge Anzaldi's ruling was to be a highly fact-intensive consideration. According to Exxon, the evidence showed that many wetlands, meadows, and forests were lawfully cleared and/or filled, as authorized by the New Jersey Riparian Commission and Riparian Grants, before they began lawfully building refinery infrastructure. Therefore, if any hazardous substances were discharged, it was argued that this could not have occurred until after the natural resources were lawfully altered from their natural state. Exxon did not dispute that they were liable for remediation, if, for example, oil spilled onto a parking lot, but the gist of their argument is that a defendant cannot be liable for natural resource damages if a *326 discharge does not adversely affect the pre-discharge *651 resource. The State's view of the evidence was that it demonstrated the wetlands were filled with contaminated fill and that this action constituted a "discharge" under the Spill Act. Therefore, the natural resources were injured prior to the commencement of refinery operations. Without passing judgment on the parties' contrasting views, the court finds that this issue, no matter how the court interpreted the Physical Modification Ruling, presented a substantial litigation risk for both the State and Exxon.
Furthermore, the court also had to construe the Physical Modification Ruling and identify modifications to which it applied. The transcript of Judge Anzaldi's Physical Modification Ruling shows that Judge Anzaldi viewed his ruling as a "generic ruling," because, as the evidence had not been established at the time, neither party was able to point to specific structures to which it was to apply. This court could have interpreted it broadly, to dismiss damages for every type of modification, even those that occurred for the purpose of receiving hazardous substances. Or, it could have interpreted it narrowly, to dismiss damages for only typical modifications, such as cutting down trees, paving roads, or constructing buildings.
Even if the court interpreted this ruling narrowly, and all the other issues were resolved in the State's favor, the State still would not have been out of the woods. As the court mentioned above, the regulations implementing the Spill Act, the Technical Requirements for Site Remediation ("Technical Regulations"), N.J.A.C. 7:26E-1.1 to - 5.8,[37] define injury as "any adverse change or impact of a discharge on a natural resource or impairment of a natural resource service, whether direct or indirect, long term or short term, and that includes the partial or complete destruction or loss of the natural resource or any of its value." N.J.A.C. 7:26E-1.8. For the purposes of the Bayway/Bayonne Litigation, the DEP took the position that the mere presence of contamination *652 not only automatically equaled an "injury," but that it equaled a 100% injury. Although the court does not pass judgment on the DEP's interpretation of this regulation, two specific phrases in its language present additional litigation risks.
The first is the regulation's use of the phrase "adverse change or impact." N.J.A.C. 7:26E-1.8 (emphasis added). According to Sacco, the "[p]resence of contamination is an adverse change." Exxon contested that one cannot assume that the presence of contamination equals an adverse change or impact and that the proper method is to measure the effect contamination has on a natural resource or its service. In fact, even Lipton was not convinced of Sacco's certitude and referenced the ancient expression of Paracelsus, the father of toxicology, that "the dose makes the poison."
The second phrase is the regulation's acknowledgement that injuries include "the partial or complete destruction or loss of the natural resource or any of its value." N.J.A.C. 7:26E-1.8 (emphasis added). By its plain language, the regulation therefore appears to contemplate losses of natural resources or their services that can be less than 100%. If this is the case, then it presents a litigation risk for the State because, as they admitted, their experts did not measure the losses of natural resources or their services. If the court's *327 review of the trial evidence showed that certain partially injured resources were still providing services, then this too would have reduced the State's damages award.
Even if this court, or any appellate court, found in the State's favor on all of these risks, disputes over two final HEA inputs could have significantly reduced the State's damages award. First, assuming the court accepted any estimate concerning the amount of money it would take to restore one acre of 100% injured intertidal wetland, it could have accepted Lipton's estimate ($274,000), Rodgers' estimate ($50,000), or some number in-between. If the court found Lipton's estimate unreliable and accepted Rodgers' estimate, assuming all other risks were resolved in the State's favor, this would have reduced the State's compensatory damages *653 recovery by billions of dollars. Assuming the court accepted Rodgers' estimate and used 1977 as the start date, this would have reduced the State's compensatory damages recovery to $707 million.
The remaining input risk concerns the appropriate HEA discount rate. The State, through Dr. Lipton, contended that practically all trustees, state or federal, and all scholars accept a 3% rate. Exxon countered with the assertion that although this may be true, none of these trustees or scholars have ever attempted to set a discount rate that dates back as far as 1877. They further asserted that a 3% rate can only be reliably used from the late-1970s onward. The court will not delve into the merits of this dispute, but it notes, for example, that had it found the appropriate discount rate to be 2%, this would have substantially reduced the State's best case compensatory recovery.
Discussed above are some of the most obvious risks the State faced if it did not settle. There are many more, including (1) whether "habitat" is a natural resource under the Spill Act; (2) the appropriate NRDA baseline; (3) the parties' "two foot sampling" dispute; (4) Exxon's argument that an award of primary restoration should obviate their ACO remediation obligations; (5) Exxon's "Act of War" affirmative defense; (6) whether Exxon was entitled to a credit for alleged benefits that the Bayway/Bayonne Facilities provided to New Jersey; (7) Exxon's equitable estoppel defense; (8) the merits of Desvousges' HEA that calculated damages at $1.4 to $3 million; and (9) Exxon's promised appeals of Exxon I and Exxon II. The litigation risk point can, and has been made, without the court reliving the seven months from September 2014 to March 2015 when it was formulating its trial opinion. See Rohm & Haas, 721 F.Supp. at 685-86 ("Ours is not, at this stage, a factfinding [sic] mission. It is rather an assignment to ensure that this is a reasonable compromise of this litigation. ... [I]t must merely be reasonable when measured by the range of plausible interpretations of that record."). Whether by one large risk breaking against the State, or numerous small risks joining forces, the *654 potential existed for the State to walk away from eleven years of litigation with little or nothing to show for it. As a final reminder, most of what the experts on both sides testified to was subject to exclusion in the Rule 104 Motions. All experts, save Morrison, testified conditionally while the Rule 104 Motions were pending.[38] Had the court granted just Exxon's Lipton Rule 104 Motion, the State could not have met its *328 burden of proof and would have recovered $0.[39]
Amici contend that because the State has not specifically explained what litigation risks drove them to settle, the Proposed Consent Judgment is not reasonable. The court is aware of no jurisdiction, state or federal, that requires trustees to point out their weaknesses, thereby exposing their vulnerabilities to future polluters. Reasonableness is judged on objective terms and does not rise and fall on a trustee's subjective fears. The court presided over this trial and understands the legal and factual risks the State and Exxon faced in the Bayway/Bayonne Litigation. In light of these risks, the Proposed Consent Judgment is an accurate reflection of the strength of the DEP's case. See id. at 687 (discussing reasonableness factors). In fact, many of these legal and factual risks also apply to potential NRD suits at the Attachment C Facilities and Retail Gas Stations. For these reasons, the court finds that the Proposed Consent Judgment is reasonable.
III.C. Faithfulness to the Spill Act's Objectives
Consideration of whether the Proposed Consent Judgment is consistent with the Spill Act's objectives necessarily "involves matters implicating fairness and reasonableness. The three broad approval criteria were not meant to be mutually *655 exclusive and cannot be viewed in majestic isolation." Cannons, 899 F.2d at 90. "[I]n attempting to gauge a consent decree's consistency with the statute, courts must give wide berth to the agency's choice[s] ...." Id. at 91 (finding that the EPA's choice of eligibility criteria for de minimis settlers "fell well within the ambit of Executive discretion"). After reviewing the Spill Act and caselaw interpreting its provisions, the court finds that the Legislature had three broad goals in mind when it passed the Act: (1) assure the prompt, effective cleanup of hazardous substances; (2) place the financial burden of cleanup on polluters; and (3) encourage early settlements.
In the Act's preamble, the Legislature declared the State's policy "to control the transfer and storage of hazardous substances and to provide liability for damage sustained with this State as a result of any discharge of said substances, by requiring the prompt containment and removal of such substances ...." N.J.S.A. 58:10-23.11a. Interpreting the Spill Act, the Supreme Court has enunciated a "polluter pays" principle. See Ventron, 94 N.J. at 499, 468 A.2d 150 ("On the balance, the benefits accorded to the public by the statute outweigh any burden imposed on the polluters."). Likewise, the purpose of the Act's 1991 amendments was to encourage early settlement by granting contribution protection to any defendant who "has entered into an administrative or judicially approved settlement with the State ...." See N.J.S.A. 58:10-23.11f. Such early settlements are beneficial because they preserve public finances, "enabling the funds to be used at other sites." Kramer, 19 F.Supp.2d at 289 (citing 131 Cong. Rec. H11,070 (Dec. 5, 1985) (statement of Rep. Florio); N.J.S.A. 58:10-23.11r ). In fact, these are the same three goals that Congress intended to achieve through CERCLA.
First, CERCLA seeks to ensure the prompt, effective cleanup of hazardous wastes. Akzo, 949 F.2d at 1439 (citing *329 Walls v. Waste Res. Corp., 823 F.2d 977, 978-79 (6th Cir. 1987) ); Cannons, 899 F.2d at 90 (quoting Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (1st Cir. 1986) ). Second, Congress *656 intended to place "the financial burden of the cleanup on the PRPs." Akzo, 949 F.2d at 1439 (citing Walls, 823 F.2d at 978-79 ); see also Cannons, 899 F.2d at 91 (quoting Dedham, 805 F.2d at 1081 ). Third, by providing broad contribution protection to early settlers, Congress sought to encourage early settlements. Davis, 261 F.3d at 27 (citing 42 U.S.C. § 9613(f)(2) ; Charter, 83 F.3d at 522 ; UTC v. Browning-Ferris Indus., Inc., 33 F.3d 96, 103 (1st Cir. 1994) ). Because the Proposed Consent Judgment furthers these three goals, it passes the third review standard prong.
First, the Consent Judgment ensures the prompt cleanup of hazardous substances. As previously discussed, it reaffirms Exxon's remediation obligations at Bayway, Bayonne, Paulsboro, the other fifteen Attachment C Facilities, and the Retail Gas Stations. At Bayway and Bayonne alone, Exxon has already spent over $257,000,000 remediating these sites, and it is expected that their future expenditures will also be in the hundreds-of-millions range.[40] Amici, however, have raised one troubling aspect of the Consent Judgment that requires discussion.
By its terms, the Consent Judgment does not actually require the State to spend the entire $225 million on the restoration and replacement of injured natural resources. According to Amici, if the money recovered is not going to be spent on environmental purposes, the Consent Judgment cannot further the Spill Act's intent. This issue arises due to a recently enacted budget provision that states:
Except as otherwise provided in this act and notwithstanding the provisions of any other law or regulation to the contrary, the first $50,000,000 [and one-half of any additional amounts] in natural resource, cost recoveries and other associated damages recovered by the State, along with such additional amounts as may be determined by the Director of the Division of Budget and Accounting, in consultation with the Attorney General, to be necessary to pay for the costs of legal services related to such recoveries, shall be deposited into the Hazardous Discharge Site Cleanup Fund established pursuant to section 1 of P.L.1985, c.247 *657 (C.58:10-23.34), and are appropriated for: direct and indirect costs of remediation, restoration, and clean up; costs for consulting, expert, and legal services incurred in pursuing claims for damages; and grants to local governments and nonprofit organizations to further implement restoration activities of the Office of Natural Resources Restoration. Recoveries in excess of the amounts appropriated pursuant to this paragraph, consistent with the terms and conditions of applicable settlement agreements or court rulings, shall be deposited in the General Fund as general State revenue.
[L. 2015, c. 63, § 44 (emphasis added) (hereinafter the "Budget Provision").]
Because the State's special counsel is seeking $50,096,966.34 in attorneys' fees, Amici read this provision to mean that $50,096,966.34 will be deducted from $225 million,[41] and the remainder will be deposited *330 into the General Fund. On the other hand, the State and Exxon argue that, first, this fee will be deducted from the $225 million. Then, $50,000,000 will be deposited into the Hazardous Discharge Site Cleanup Fund. Finally, the excess will be deposited into the General Fund. Assuming these are the only two ways to reconcile the Proposed Consent Judgment with the Budget Provision, the court finds that the State's reading is the more plausible interpretation.
The plain language of the Budget Provision states that "the first $50,000,000 ... along with such additional amounts... necessary to pay for the costs of legal services related to such recoveries, shall be deposited into the Hazardous Discharge Site Cleanup Fund ...." L. 2015, c. 63, § 44. This language supports the State's reading because $50,000,000 "along with" $50,096,966.34 will be deposited into the Hazardous Discharge Site Cleanup Fund. The "excess," $124,903,033.66, will then be deposited into the General Fund. The Proposed Consent Judgment's fidelity to the Spill Act's objectives, then, depends upon the answer to the following question: Can a NRD settlement that only allocates $50,000,000 to restoration and replacement be considered to further *658 the Spill Act's goal of prompt, effective environmental cleanup? The court answers this question in the affirmative.
When interpreting statutes, "it is not proper statutory construction to reach a result that would render a provision completely meaningless." Exxon I, 393 N.J. Super. at 409-10, 923 A.2d 345 (citing Gabin v. Skyline Cabana Club, 54 N.J. 550, 555, 258 A.2d 6 (1969) ). Here, the court has before it two statutes, the Spill Act and the Budget Provision. The Spill Act expressly contemplates the judicial approval of settlements. N.J.S.A. 58:10-23.11f. The Budget Provision, which acknowledges the settlement of NRD suits, was passed against the backdrop of both N.J.S.A. 58:10-23.11f and a string of federal district court decisions that analyzed Spill Act settlements for fairness, reasonableness, and fidelity to the statute. The court finds that under Gabin's reasoning, courts should also not interpret two statutes so as to render one of them completely meaningless. This is what would happen if the court accepted Amici's reasoning.
With the Budget Provision, the Legislature has implicitly contemplated judicial approval of NRD settlements where only a portion of the recovery goes into the Hazardous Discharge Site Cleanup Fund. If the court used the Budget Provision to find that the Proposed Consent Judgment is not consistent with the Spill Act's goals, then the budget provision would be completely meaningless because no settlement over $50,000,000 could ever be approved. The Legislature could not have intended such a result. Moreover, in a similar vein, courts have approved consent decrees that do "not provide for full restoration and replacement of the injured natural resources ...." Acushnet River, 712 F.Supp. at 1033-37. Had the express terms of the Proposed Consent Judgment mandated that no money would go towards environmental cleanup or restoration purposes, this would be a different issue. This situation, however, is not before the court.
Above, the court used the phrase, "Assuming these are the only two ways to reconcile the Proposed Consent Judgment with the Budget Provision ...." This is because there is a third *659 interpretation *331 that reconciles the Consent Judgment with the Budget Provision. As stated in the Consent Judgment, Exxon agrees to pay the State "$225 million by certified check made payable to 'Treasurer, State of New Jersey,' or by wire transfer pursuant to instructions provided by the [State]." Upon receiving this payment, the State "shall place that money in a segregated account within the Hazardous Discharge Site Cleanup Fund (the "Account"). Until this Consent Judgment becomes final and non-appealable, the settlement funds in the Account shall earn interest and may not be used by the State of New Jersey for any purpose." It is well established that, under New Jersey law, a "settlement agreement between parties to a lawsuit is a contract." Nolan, 120 N.J. at 472, 577 A.2d 143 (citing Pascarella v. Bruck, 190 N.J. Super. 118, 124, 462 A.2d 186 (App. Div. 1983) ). This means that, pursuant to general contract law, the proper way to interpret the Proposed Consent Judgment is by giving effect to the plain meaning of its language. Atl. N. Airlines v. Schwimmer, 12 N.J. 293, 301, 96 A.2d 652 (1953) ("The polestar of construction is the intention of the parties to the contract as revealed by the language used ...."). Under this plain language, the State "shall place [the entire $225 million] in a segregated account within the Hazardous Discharge Site Cleanup Fund."
Although, pursuant to the Budget Provision, amounts in excess of the first $50,000,000 "shall be deposited in the General Fund as State revenue," this only occurs when the terms and conditions of a settlement do not mandate the money go elsewhere. See L. 2015, c. 63, § 44 ("Recoveries in excess of the amounts appropriated pursuant to this paragraph, consistent with the terms and conditions of applicable settlement agreements or court rulings, shall be deposited in the General Fund as general State revenue." (emphasis added) ). The Consent Judgment mandates that the State deposit the entire $225 million in the Account located within the Hazardous Discharge Site Cleanup Fund. Therefore, under this third interpretation, it appears that under the plain language of both the Proposed Consent Judgment and the Budget Provision, the "recoveries in excess" language of the Budget Provision does *660 not apply to the placement of the Proposed Consent Judgment funds.
Neither the parties nor Amici, however, have asked this court to interpret the terms of the Proposed Consent Judgment, and for this reason, the court, at this point, has no role in deciding the ultimate fate of the State's recovery. The interpretation the court suggests is only provided to add even greater weight to its finding that the Consent Judgment is consistent with the Spill Act's goals. There may very well be a mechanism by which the State can remove amounts initially deposited into the Hazardous Discharge Site Cleanup Fund and use those amounts for other purposes. For the purposes of this decision, the court finds that if only $50,000,000 is going towards cleanup and restoration, or if the entire $225,000,000 is going towards cleanup and restoration, under either scenario, the Proposed Consent Judgment ensures the prompt, effective cleanup of hazardous wastes.
The Proposed Consent Judgment also furthers the Spill Act's second goal by placing the financial burden of cleanup on Exxon. Under their ACO remediation obligations, which the Proposed Consent Judgment reaffirms, Exxon must cleanup Bayway, Bayonne, Paulsboro, the other fifteen Attachment C Facilities, and the Retail Gas Stations at their costs. Furthermore, it requires Exxon to pay $225 million for a release of the State's pending and potential NRD claims at these sites. Additionally, it reserves the State's right to pursue its Surface Water Claims and all *332 MTBE claims. Whether through litigation or settlement, the State may be able recoup further payments from Exxon.
Finally, the Proposed Consent Judgment furthers the Spill Act, and indeed general New Jersey policy of promoting settlement. The court finds that through the passage of CERCLA and the Spill Act, both Congress and the New Jersey Legislature set a policy to encourage the efficiency of settlements over protracted litigation. These statutes provide contribution protection to settling defendants in order to induce them into settling, protection which the Consent Judgment extends to Exxon. See *661 N.J.S.A. 58:10-23.11f ; Acushnet River, 712 F.Supp. at 1027 ("The carrot the EPA can offer potential settlors is that they need no longer fear that a later contribution action by a non-settlor will compel them to pay still more money to extinguish their liability.").
One could argue that the Proposed Consent Judgment does not actually further the "settlement goal" because both CERCLA and the Spill Act favor "early settlements," and this settlement cannot be considered early after eleven years of litigation. This contention ignores the fact that the parties are settling many potential claims at the Attachment C Facilities and Retail Gas Stations. The court finds that the Consent Judgment, therefore, furthers the goal of early settlement by avoiding the lengthy delays and expenses that have plagued the Bayway/Bayonne Litigation and Paulsboro Litigation. Given the protracted nature of the Bayway/Bayonne Litigation, and potentially lengthy litigation concerning the other sites, "the Court believes the public interest in the efficient and expeditious resolution of environmental cleanup claims strongly militates in favor of entering the [Proposed Consent Judgment]." Litgo N.J., Inc. v. Martin, No. 06-2891 (AET), 2011 WL 5325655, at *3, 2011 U.S. Dist. LEXIS 127273, at *10 (D.N.J. Nov. 2, 2011).
Settlements are a particularly effective way of furthering the Spill Act's goals because they lock in swift guaranteed compensation. Numerous courts have recognized that "the immediate transfer of funds is a significant factor" when considering fidelity to the statute and public interest. See, e.g., Acushnet River, 712 F.Supp. at 1029 ("The immediate transfer of funds is a significant factor because it gives the sovereigns control over and the interest derived from a substantial amount of money."); Exxon, 697 F.Supp. at 693 ("The immediate public benefit is the availability of $13,798,472 for cleanup and remediation costs which might otherwise be drawn from public coffers."). In fact, settlement has long been the tactic of choice for the DEP, which has never won NRD litigation and had recovered only $115 million in cooperative NRD settlements prior to the commencement of this suit. Even if the court were to reject this settlement and issue its opinion, due to *662 either Exxon's or the State's appeals, the State would not receive any money from Exxon for perhaps another decade.[42] In fact, due to litigation risks, far from being unguaranteed, the State's eventual compensation could be nothing. This settlement also furthers the Spill Act's objectives because it preserves Exxon I, the Retroactivity Ruling, and the Public Trust Ruling,[43] all decisions that will aid the State in future litigation and settlement *333 negotiations.[44] For these reasons, the court finds that the Proposed Consent Judgment is faithful to the Spill Act's objectives.
IV. Public Interest
The court agrees with the CERCLA caselaw that "[p]rotection of the public interest is the key consideration in assessing whether a decree is fair, reasonable, and adequate." Akzo, 949 F.2d at 1435. In fact, during its review of the Proposed Consent Judgment, this was the court's "core concern." See Rohm & Haas, 721 F.Supp. at 680 ("The court's core concern in deciding whether to approve this proposed decree is with ensuring that the decree furthers the public interest as expressed in CERCLA." (citing Seymour, 554 F.Supp. at 1337 ; H.R. Rep. No. 253, 99th Cong., 1st Sess. 19 (1985) ) ). For this reason, the court gave special attention to the points raised in the Public Comments and Amici's written and oral arguments, which served a vital role in the present Spill Act settlement review. The Public Commenters, through their observant remarks on the Proposed Consent Judgment have provided the court with invaluable assistance by giving voice to their objections, along with a few supportive comments.
*663 With these public submissions in mind, when an agency charged with acting in the public interest, such as the DEP, finds that the public interest is best served through settlement, that decision is entitled to deference. See Nucor Corp, 825 F.Supp. at 1464. Although the court should not mechanistically rubberstamp an agreement, it "must refrain from second-guessing the Executive Branch," Cannons, 899 F.2d at 84 (emphasis added), as the standard "is not whether the settlement is one which the court itself might have fashioned, or considers ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute." Ibid. (citing Durrett, 896 F.2d at 604 ). As settlements are the product of compromise, no settlement will ever perfectly award the State everything that it wants. Due to the reasons discussed in Section III, and the considerations outlined in the remainder of this opinion, the court finds that approval of the Proposed Consent Judgment is in the public interest.
* * *
A number of Public Comments and Amici believe that the Proposed Consent Judgment's Surface Water Claims Provision is a one-sided giveaway to Exxon. Under this provision, the State dismisses the Surface Water Claims without prejudice and agrees that they can only be brought in the future in a multi-defendant action if a formal natural resource damage assessment is completed by the applicable trustee through a procedure that allows for Exxon's participation. Those opposing this provision argue that there is no reason for the State to dismiss its claims because they already have a suit pending. Further, they contend that allowing Exxon, and Exxon alone, to participate in a pre-suit NRDA benefits Exxon at the expense of the State and other potential defendants. On the "surface," the court initially found this to be one of the more troubling provisions. After conducting its own independent review of NRDA procedures found in the record and examining the State's and Exxon's responses, the public's concerns have been addressed. It is readily apparent that for at least *664 four reasons, this provision is beneficial to the State, Exxon, *334 and other potential defendants and in the public interest.
First, by performing a NRDA before filing a complaint, the State avoids the very situation for which Amici have faulted the State regarding the Attachment C Facilities and Retail Gas Stations. If, down the road, the DEP believes that settlement of the Surface Water Claims is in the public interest, during that settlement review proceeding, the reviewing judge will have a fuller record. Second, by performing the NRDA pre-complaint, the State will know not only whom to sue, but also against whom its case is strongest.
Third, allowing for Exxon's participation creates the cooperation that the DEP has consistently pointed out was lacking and led to the Bayway/Bayonne Litigation. The vast majority of the DEP's prior settlements were done cooperatively through the less costly administrative process. Undoubtedly, when, PRPs and trustees work together the public interest is served. Nothing in the Consent Judgment prevents the DEP from inviting other potential defendants to participate in the NRDA. The State, as well as counsel for Exxon, speaking on the company's behalf during oral argument, has represented that Exxon welcomes the other major generators being invited to participate. This is because a process that allows for all parties to participate at the beginning allows for cost sharing and prevents the need for a supplemental study done years later. The fact that no companies operating in the vicinity of the Arthur Kill have provided objections to this Consent Judgment provision is suggestive that they too see the benefits of its inclusion.
Fourth, due to the interstate nature of the surface waters, it is likely that in the re-filed suit, there will be a joint-trusteeship between the DEP and federal government. If CERCLA or Oil Pollution Act claims are brought, the trustees will not get to pick and choose who completes the NRDA, rather they will be required to"invite the participation of [all] potentially responsible part[ies]." 43 C.F.R. 11.32(a)(2)(iii)(A) ("The authorized official *665 shall send a Notice of Intent to Perform an Assessment to all identified potentially responsible parties. The Notice shall invite the participation of the potentially responsible party, or, if several parties are involved ... in the development of the type and scope of the assessment and in the performance of the assessment." (emphasis added) ). For these reasons, the court finds that the Surface Water Claims Provision is in the public interest.
The next two objections concern the Consent Judgment's interplay with legislatively enacted laws. Amici and the Public Comments, particularly those by the Clayton Block Company, Inc. and the Linden Roselle Sewerage Authority ("LRSA"), claim that the contribution protection granted to Exxon in the Consent Judgment is another giveaway. This provision, however, is beyond the court's control. The Spill Act expressly mandates that anyone who "has entered into an administrative or judicially approved settlement with the State, shall not be liable for claims for contribution regarding matters addressed in the settlement or the final remediation document, as the case may be." N.J.S.A 58:10-23.11f(a)(2)(b) (emphasis added). In fact, the Legislature amended the Spill Act to include this provision in order to induce defendants into settling. This proverbial carrot is also a tool federal trustees employ to encourage settlement. See 42 U.S.C. § 9613(f)(2). This litigation has been proceeding for eleven years, and during this time, nothing has prevented Clayton Block, the LRSA, or other companies from doing what Exxon has now done: voluntarily settle potential claims against *335 them and receive contribution protection. Moreover, the court will not disapprove the Consent Judgment for this reason because "the ultimate measure of accountability in an environmental case is the extent of the overall recovery, not the amount of money paid by any individual defendant." Charles George, 34 F.3d at 1086. If the public perceives the Spill Act's contribution protection provision as unfair, their redress is through the political branches of government.
The fact that Exxon may be able to deduct their settlement payment on their state and federal tax returns is also not a reason *666 to deny approval. As with contribution protection, the Legislature and Congress allow settling defendants to deduct settlement payments. The court is aware of no federal or state court that has rejected a NRD settlement because the settling defendant could deduct its payment. In fact, the court is aware of no party that has ever even raised this issue. The court believes this is so because this objection is without merit. Courts do not wade into the tax strategies of multi-national corporations and determine how much, if any, of settlement payments they are going to deduct from their New Jersey state taxes. If this court were to reject the Proposed Consent Judgment for this reason, it would set a draconian precedent whereby every settlement, NRD or otherwise, could be rejected. Such a result would be contrary to this state's pro-settlement policy.
Two other objections concern the fact that the State must bear its own costs and expenses in the Bayway, Bayonne, and Paulsboro Litigation and that Exxon does not admit liability. These provisions are standard settlement language in all fields of the law. In fact, Exxon also denied liability in both 1991 ACOs, and no one took any issue at that time.
The Environmental Groups also argue that the Proposed Consent Judgment cannot be in the public interest because it releases Exxon for "all NRD claims asserted or that could have been asserted" in the Bayway/Bayonne Litigation. According to them, the DEP could have CERCLA, Oil Pollution Act, Clean Water Act, and/or Water Pollution Control Act claims arising out of the contamination at Bayway and Bayonne. This argument must fail for two reasons. First, plaintiffs are not allowed co-extensive double recoveries. If the DEP is recovering from Exxon for damages under the Spill Act, the DEP cannot also recover from Exxon for those same damages under other statutes or common law principles. Second, even if the DEP did not explicitly release Exxon from these claims, these claims are likely implicitly barred by the entire controversy doctrine, which requires plaintiffs to bring all possible claims in the same lawsuit when those claims *667 arise out of the same cause of action. McNeil, 177 N.J. at 395, 828 A.2d 840 ("The concept that a party is required to bring all possible claims in one proceeding is embodied in the closely linked concepts of res judicata and the entire controversy doctrine."); Pressler & Verniero, cmt. 2 on R. 4:30A.
Although the court's initial fears concerning the Surface Water Claims Provision have been completely allayed, the Proposed Consent Judgment's Morses Creek Deferral Provision still gives the court pause, though not fatally so. Paragraph Thirteen states:
Because Morses Creek receives process water discharges from the Bayway Refinery Complex ("BRC"), and because of resulting operational conditions and restrictions at Morses Creek, the final remedy determination and remediation for Morses Creek, as depicted in Attachment A attached hereto, will be deferred until the cessation of refining operations *336 at the BRC site, which will be when operational conditions at the BRC no longer require the regular discharge into Morses Creek of 30 million gallons *337 per day or more of once-through non-contact cooling water pursuant to NJPDES Permit No. NJ0001511 (or as renewed/reissued). Notwithstanding this deferral, ExxonMobil will continue to timely comply with its permit and other regulatory obligations through the completion of the feasibility study for Morses Creek.
On its face, a provision that delays remediation of a contaminated creek until the cessation of refining operations seems anathema to a statute and review standard that seeks to ensure the prompt, effective cleanup of hazardous wastes. There are, however, a number of plausible explanations for this paragraph's inclusion in the Consent Judgment. But first, some background is required.
The DEP introduced evidence at trial that demonstrated Morses Creek has been contaminated with hazardous substances. In fact, it is not a stretch to say that, because Exxon is required to remediate Morses Creek under the 1991 Bayway ACO, it is undisputed that the Creek is contaminated. Since 1909, the Creek has always served an integral role to the operation of the Bayway Refinery Complex. In order to provide cooling water for the refinery process, non-contact cooling water, which is not commingled with refinery product, is run through the plant and discharged back into the Creek. The discharge of cooling water into the Creek is allowed because every year the DEP, pursuant to *668 their regulatory authority, grants the owner of the refinery a permit to do so, currently NJPDES Permit No. NJ0001511.
During trial, Exxon introduced evidence and extensively cross-examined Horsak and Ostermiller in an attempt to show that primary restoration of the Creek was not practicable. They also provided testimony of plant personnel with knowledge of the refinery's operations. Basically, their argument boiled down to the assertion that to implement the DEP's restoration plan for the Creek, the refinery, which is currently owned by Phillips 66, would have to cease to operate as a viable refinery. In fact, for the past two decades, a debate has been ongoing between the parties concerning whether remediation can occur while the refinery still operates. Furthermore, although Exxon's successors in interest must allow Exxon onto the site so that they can comply with their remediation obligations, Exxon arguably does not have the power to force Phillips 66 to close the refinery so that Exxon can comply with these obligations. Taking these considerations into mind, the State and Exxon have proffered a number of reasonable explanations for this provision's inclusion.
First, if Exxon and the DEP attempted to remediate the Creek while 30 million gallons of water were being discharged into the Creek per day, their task would be nearly impossible. There was no trial evidence that provided a practicable alternative for long-term water supply. For this reason, any remediation they attempted might not be possible, let alone effective. By waiting until the refinery no longer discharges 30 million gallons of water into the Creek, the public is guaranteed that remediation will be more complete and thorough. In this sense, the provision, like the rest of the Proposed Consent Judgment, is a reasonable compromise, even with the extended deferral.
Second, the provision is in the public interest because it only defers remediation until "operational conditions at the BRC no longer require the regular discharge into Morses Creek of 30 million gallons per day or more of once-through non-contact cooling water ...." In their critique, Amici have overlooked this *669 clause and instead only focus on the "cessation of refining conditions" language. This clause defines what the cessation of refining conditions are under the Consent Judgment. Currently, technology does not exist that would allow one to operate the refinery without using at least 30 million gallons of non-contact cooling water. Once that technology is developed, either the refinery owner will voluntarily adopt the new technology, or the DEP will cease to issue "NJPDES Permit No. NJ0001511 (or as renewed/reissued)." Once either of these events occur, the DEP will then have a right to require Exxon to fully remediate Morses Creek under the ACO and Consent Judgment.
Third, even if the court were to reject the Consent Judgment, Morses Creek could not be remediated anytime in the immediate future. Under the Bayway ACO, Exxon is obligated to complete a feasibility study for Morses Creek. This study will identify a range of options and available technology concerning how to go about remediation. After reviewing this study, the DEP will then select the best option and issue Exxon a permit allowing them to remediate the Creek. The Proposed Consent Judgment still requires Exxon to comply with its obligation to complete the feasibility study. The study, which recommends the appropriate technology, should therefore be completed by the "cessation of refining operations," allowing the DEP to select a remedy in a timely fashion.
Like settlement negotiations in general, the Morses Creek deferral has been an ongoing dispute between the DEP and Exxon. In their effort to achieve near global peace, they have included their resolution of this debate within the Proposed Consent Judgment. The Legislature has designated the DEP, not the courts, with the task of bringing and settling NRD lawsuits. The caselaw describing a court's task of reviewing trustee settlements is clear: when a court finds that the trustee has reviewed the underlying evidence and provided a plausible explanation for its decision, it must defer to the agency's expertise. See Tutu Water Wells, 326 F.3d at 207 ; Akzo, 949 F.2d at 1426 ;
*670 Cannons, 899 F.2d at 84 (stating that "the district court must refrain from second-guessing the Executive Branch"); In re MTBE, 33 F.Supp.3d at 264 ("Under New Jersey law, a court will not 'second-guess those judgments of an administrative agency,' like the NJDEP, which 'fall squarely within the agency's expertise.' " (quoting In re Stream Encroachment Permit, 402 N.J. Super. at 597, 955 A.2d 964 ) ); Gloucester, 591 F.Supp.2d at 753 ("Agency action is arbitrary and capricious if it has 'no rational basis' or if the action is 'willful and unreasoning ... without consideration and in disregard of circumstances.' " (alteration in original) (quoting In re Xanadu, 402 N.J. Super. at 642, 955 A.2d 976 ) ); In re Stream Encroachment Permit, 402 N.J. Super. at 598, 955 A.2d 964 (stating that "if there is any fair argument in support of the course taken [by the agency] or any reasonable grounds for difference of opinion among intelligent and conscientious officials, the decision conclusively is legislative and will not be disturbed unless patently corrupt, arbitrary or illegal. Doubts held by the courts as to the wisdom of the administrator's decision do not alter the case" (alteration in original) (quoting N.J. Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562-63, 384 A.2d 795 (1978) ). For years, the DEP has contemplated Morses Creek remediation and has now provided a reasonable explanation for why that remediation should be deferred.
*338 One thing is for sure: Morses Creek will be remediated much faster through the parties' cooperation under the Consent Judgment than through prolonged battles in appellate courts. The public interest would not be served by an ineffective or incomplete Morses Creek remediation. Nor would it be served through the unintended consequence of closing the refinery. An attempted closure would undoubtedly generate years of litigation between Phillips 66, Exxon, and the State. This litigation would further delay remediation, which would not be in the public interest or effectuate the Spill Act's goals.
Finally, the Public Comments and Amici contend that the court has no authority to enter the Attachment C Facility and *671 Retail Gas Station portions of the settlement. For support they rely on Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, which they contend recognized "that a consent decree cannot provide greater relief than a court could have ordered after a trial." 478 U.S. 501, 524, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). Applying this general principle to the Proposed Consent Judgment, they argue that the court cannot approve it because it provides greater relief than the court could have awarded after the Bayway/Bayonne Litigation. Assuming Firefighters applies to the present matter, the court is not convinced.
Firefighters laid out a three pronged test for when courts can enter consent decrees. The decree must (1) spring from and serve to resolve a dispute within the court's subject-matter jurisdiction; (2) come within the general scope of the case made by the pleadings; and (3) further the objectives of the law upon which the complaint was based. Firefighters, 478 U.S. at 525, 106 S.Ct. 3063 (citations omitted). After laying out this test, Firefighters made clear that because "the parties' consent animates the legal force of a consent decree. ... A federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial." Ibid. (citations omitted). When reviewing consent decrees under this test, courts have repeatedly declined to endorse Amici's "crabbed view." Natural Res. Def. Council v. Whitman, No. C 99-03701 WHA, 2001 WL 1221774, at *11-12, 2001 U.S. Dist. LEXIS 18435, at *36 (N.D. Cal. 2001) ; see also Alcan Aluminum Corp. v. Butler Aviation-Boston, Inc., No. CV-02-0562, 2003 WL 22169273, at *6, 2003 U.S. Dist. LEXIS 16435, at *20 (M.D. Pa. 2003) (noting that "a party can receive contribution protection with respect to a matter for which the government does not make a claim against that party"); Sierra Club v. Browner, No. 93-124 (NHJ), 1994 WL 750290, at *3, 1994 U.S. Dist. LEXIS 16400, at *10 (D.D.C. 1994) (approving consent decree even though the "EPA voluntarily agreed to relief that may have been beyond this Court's power to order after trial" because "such relief is fair, within the general *672 scope of a lawsuit within the subject matter jurisdiction of this Court, and consistent with Congress's Clean Air Act objectives").
For instance, the U.S. District Court for the Northern District of California has held that "a court may enter a consent decree that provides relief beyond what a court could otherwise accord so long as some substantial part of it was within its jurisdiction." Whitman, 2001 WL 1221774, at *11, 2001 U.S. Dist. LEXIS 18435, at *35 (emphasis added). As to the second prong, a decree is within the general scope of the case made by the pleadings when the decree addresses the harm that was alleged in the complaint. Id. at *12, 2001 U.S. Dist. LEXIS 18435, at *38 (discussing the Third Circuit's approach in *339 Sansom Comm. v. Lynn, 735 F.2d 1535, 1539 (3d Cir. 1984) and the Ninth Circuit's approach in Sierra Club, Inc. v. Elec. Controls Design, Inc., 909 F.2d 1350, 1355 (9th Cir. 1990) ). Applying these principles, this court can approve the Proposed Consent Judgment.
As a New Jersey court of general jurisdiction, this court has subject-matter jurisdiction over Spill Act claims. The Consent Judgment is within the general scope of the case made out by the pleadings because the complaint alleges harm to the State's natural resources, and the Consent Judgment addresses that harm. Finally, as discussed in Section III.C., the Consent Judgment furthers the Spill Act's objectives. In fact, rejecting an argument similar to that which Amici make, the Northern District of Indiana has approved a CERCLA consent decree that released BP from liability for eight refineries when not all eight were listed in each count of the complaint. BP Exploration, 167 F.Supp.2d at 1052. Any other result would be contrary to the Spill Act's settlement goal and contrary to the public interest.
V. Conclusion
Nearly a year ago, the court began the task of drafting its decision on the multitude of issues raised by the parties during trial. In February of this year, and almost 300 pages later, the court was informed of the Proposed Consent Judgment. Putting the draft decision aside, the court took up the chore of determining *673 whether the Consent Judgment is fair, reasonable, faithful to the Spill Act's goals, and in the public interest. In many respects, this effort was more difficult than consideration of the merits decision-and no less important.
After years of litigation and negotiations, the New Jersey Department of Environmental Protection and Exxon Mobil Corporation have resolved their disputes and potential disputes over Bayway, Bayonne, Paulsboro, fifteen other Attachment C Facilities, and 1768 Retail Gas Stations. Through the approval of the Proposed Consent Judgment, the DEP will recover $225 million for alleged natural resource damages, while still retaining their right to refile their Surface Water Claims and pursue MTBE pollution allegedly caused by Exxon. In reaching this result, the court finds that the DEP applied rational methods in order to estimate total damages and determine what a fair payment would be for those damages. Although far smaller than the estimated $8.9 billion in damages, Exxon's payment represents a reasonable compromise given the substantial litigation risks the DEP faced at trial and would face on appeal. Furthermore, the Consent Judgment is faithful to the Spill Act's goals and in the public interest. For these reasons, the DEP's motion to approve the Proposed Consent Judgment is GRANTED.

Additional information can be found in the Appellate Division's three interlocutory appeal opinions and this court's opinion disposing of four intervention motions. N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., 420 N.J. Super. 395, 397-401, 22 A.3d 1 (App. Div. 2011) ; N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., No. A-0316-09T2 (App. Div. May 31, 2011) (slip op. at 1-2, 24-25), 2011 WL 2304026 ; N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., 393 N.J. Super. 388, 391-97, 923 A.2d 345 (App. Div. 2007) ; N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., No. UNN-L-3026-04 (Law Div. July 13, 2015) (slip op. at 1-6), 2015 WL 10015127. The court is mindful that Rule 1:36-3 generally precludes the citation of unpublished opinions. However, the rule permits such citations "to the limited extent required by the application of preclusionary legal principles or case history." Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 1:36-3 (2016). See, e.g., Animal Prot. League of N.J. v. N.J. Dep't of Envtl. Prot., 423 N.J. Super. 549, 556 n.2, 34 A.3d 784 (App. Div. 2011) ("Although this opinion is unreported and not cited as precedent, R. 1:36-3, it is useful for the limited purpose of presenting relevant but general background and history.").

Such industry included a lead and zinc company, varnish works, and powder mill.

Standard Oil is Exxon's predecessor in interest. In this opinion, the company names are used interchangeably.

Bayonne is currently situated at 250 East 22nd Street, Bayonne, New Jersey.

IMTT entered into an NRD settlement with the State for $3 million.

Bayway is currently situated at 1400 Park Avenue, Linden, New Jersey.

For the Spill Act's definition of "hazardous substances," see N.J.S.A. 58:10-23.11b.

Although the Bayway Complaint was filed in Union County and the Bayonne Complaint was filed in Hudson County, the complaints were eventually consolidated under Union County Docket Numbers: UNN-L-3026-04 (Bayway) and UNN-L-1650-05 (Bayonne).

The parties jointly agreed to this bifurcation because litigation involving the Surface Water Claims (the Kill Van Kull, Upper New York Bay, Arthur Kill, and Rahway River) was expected to include hundreds of potentially responsible parties. On the other hand, they expected litigation involving the Property Claims to only involve the State and Exxon. All further references in this opinion to the Bayway/Bayonne Litigation concern the State's Property Claims.

Compensatory damages were broken down as follows: $3.014 billion for intertidal salt marsh restoration, $3.042 billion for palustrine meadow restoration, and $308 million for upland meadow restoration.

Prior to 1991, statutes of limitation did not run against the State, pursuant to the common law doctrine of nullum tempus occurrit regi ("no time runs against the king"). After the New Jersey Supreme Court abolished this doctrine, the Legislature responded by adopting a general ten-year statute of limitations. N.J.S.A. 2A:14-1.2. In July 2001, this general statute was amended to reference an extension statute governing environmental contamination matters. This statute was again amended and extended in December 2005. Currently, the extension statute expands the ten-year limitation by five years and six months, so that the statute does not run until fifteen years and six months after a cause of action accrues under the State's environmental laws. Exxon II, 420 N.J. Super. at 398-400, 22 A.3d 1.

On the same day that he ruled in Exxon's favor concerning the statute of limitation's application to the common law strict liability count, Judge Anzaldi also denied the DEP's motion for interlocutory payment of approximately $1 million in natural resource damage assessment costs. Although the DEP also appealed this decision, the Appellate Division, on the same day that it released Exxon II, also released a third interlocutory appeal decision affirming Judge Anzaldi's denial of the payment motion. N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., No. A-0316-09T2 (App. Div. May 31, 2011) (slip op. at 1-2), 2011 WL 2304026.

Due to the expected length of the trial, and as a convenience to the court, the parties agreed to have the case tried in Burlington County.

Pursuant to New Jersey Rule of Evidence 104(a), "When the qualification of a person to be a witness, or the admissibility of evidence ... is in issue, that issue is to be determined by the judge." At these "104 Hearings," either party may challenge the qualifications of the other side's expert witness or the admissibility of that witness's testimony.

For how the State's proffered experts are relevant to the court's decision to approve the Proposed Consent Judgment, see infra Part III.B.

The sixteen Attachment C Facilities are: (1) Atlantic City Terminal 99-ACP; (2) Atlantic City Terminal # 3001; (3) Edison Research Lab; (4) Edison Synthetics Plant; (5) Flemington Terminal; (6) Florham Park Facility; (7) Trenton Terminal # 29005; (8) Linden Technical Center; (9) Linden Terminal # 29074; (10) Long Branch Terminal; (11) Morristown Municipal Airport Fuel Farm; (12) Paulsboro Terminal # 3045; (13) Paulsboro Lube Plant # 29004; (14) Former Tomah Facility; (15) Pennington Facility; and (16) Teterboro Airport Fuel Farm.

In addition to the Bayway/Bayonne ACOs, Exxon has entered into ACOs for the Attachment C Facilities and Retail Gas Stations.

After reviewing these comments, on July 9, 2015, the DEP released its "Response to Public Comments" and formally moved for approval of the Proposed Consent Judgment. Exxon also filed a brief in support of the Consent Judgment.

As to the Intervention as of Right Motions, the court found that the DEP adequately represented the movants and that their motions were not timely. Exxon III, slip op. at 25-26. As to the permissive intervention motions, the court found that they were not timely, would unduly delay proceedings, and prejudice the adjudication of the rights of the original parties. Id. at 31.

The In re MTBE litigants also agreed on this standard for review of Spill Act settlements. 33 F.Supp.3d at 265 n.39.

The CERCLA review standard comes from the Superfund Amendments and Reauthorization Act of 1986's legislative history. United States v. Cannons Eng'g Corp., 899 F.2d 79, 85 (1st Cir. 1990) (citing H.R. Rep. No. 253, Pt. 3, 99th Cong., 1st Sess. 19 (1985), reprinted in 1986 U.S.C.C.A.N. 3038, 3042).

"PRP" is shorthand for "potentially responsible party."

In Montrose, the Ninth Circuit used the word "settlor" to refer to parties settling a lawsuit. Other courts use the word "settler" to refer to the same thing. When quoting sources, this court will use the word used in the source. When not quoting sources, the court will use "settler."

In addition to Montrose and Tucson, the United States District Courts for the Districts of Colorado and Southern District of New York have rejected proposed consent decrees under this standard. In re MTBE, 33 F.Supp.3d at 271 (rejecting a Spill Act judicial consent order because the DEP "created an unreliable list of 498 sites to determine total damages" and "assigned a an [sic] arbitrary $50,000 damages value" to 4547 other sites); Telluride, 849 F.Supp. at 1403-04 (rejecting a Clean Water Act consent decree because "the EPA relied heavily, if not exclusively," on the defendant's expert report "to produce the work plan for ... remediation and mitigation projects").

These settlements involve fairness in affordable housing.

Courts' review of these settlements to ensure they "adequately protect[ ] the interests of the persons on whose behalf the action was brought," is analogous to protection of the public interest. Mount Laurel suits are brought on behalf of those seeking affordable housing, while Spill Act NRD suits are brought by the DEP on behalf of the public.

The court views the parties' assertion in the Proposed Consent Judgment that "this Consent Judgment is fair, reasonable, and in the public interest," as further evidence that they agree with Amici that this is the correct standard.

Negotiations conducted through a mediator, especially a respected jurist, are a particularly effective way of ensuring a consent judgment's procedural fairness, and this court urges the DEP and future defendants to take advantage of this technique.

Although Amici have argued that the Consent Judgment's reaffirmation of Exxon's ACO remediation duties is meaningless, this reaffirmation is important because without it, Exxon had a colorable argument that a primary restoration award released them from their remediation responsibilities.

For the court's analysis of these issues, see infra Section IV.

In the present case, this consideration might not seem to have that much relevance because Exxon is the only defendant. In its seminal CERCLA settlement decision, however, the First Circuit noted that reasonableness, fairness, and fidelity to the statute "are all mutable figures taking on different forms and shapes in different factual settings. ... We believe that Congress intended, first, that the judiciary take a broad view of proposed settlements ...." Cannons, 899 F.2d at 85. The court finds that the broad principles of this tripartite formula are applicable in all Spill Act settlement cases. As a note to future reviewing trial courts, in situations where there are multiple defendants, "The proper way to gauge the adequacy of settlement amounts to be paid by settlings PRPs is to compare the proportion of total projected costs to be paid by the settlors with the proportion of liability attributable to them." Davis, 261 F.3d at 24 (citing Charles George, 34 F.3d at 1087 ).

The $4 million amount does not include the DEP's estimate of injuries caused by the discharge of MTBE, which is present at eight of the sixteen Attachment C Facilities. The Proposed Consent Judgment specifically reserves the DEP's right to bring future suits to recover for MTBE damages.

Although the In re MTBE district court initially rejected a settlement between the DEP and Citgo, that settlement has since been approved.

These were settlements in which the State both received and could tie a monetary award for both primary and compensatory restoration to specified acres of contaminated wetlands and in which defendants still had their cleanup and remedial obligations.

These active spreadsheets were based on the State's static spreadsheets in evidence.

Whether the court would have accepted the HEA methodology itself, not just its inputs, is also a risk. At trial, HEA's reliability was a question of first impression for New Jersey courts.

Adopted in 1993, the Technical Regulations were amended in 1997 to include natural resource damages.

During oral argument, Amici admitted that they had not read either parties' Rule 104 motions.

In its merits opinion, the court would have disposed of all trial risks discussed in this section. In this settlement opinion, the court does not pass judgment on any trial or appellate risks.

For a discussion of the Proposed Consent Judgment's "Morses Creek Deferral" and how this deferral is both consistent with the Spill Act's goals and furthers the public interest, see infra Section IV.

This discussion of special counsel's fee is, of course, only relevant if the court approves this fee. By way of letter opinion and order issued the same day the court approves the Proposed Consent Judgment, the court also approves the fee. N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., No. UNN-L-3026-04 (Law Div. Aug. 25, 2015) (slip op. at 1).

This, of course, assumes the court would have awarded any money in the first place.

This settlement is also advantageous because it preserves Exxon II. Although this ruling furthers environmental cleanup, the court has not listed it along with these other rulings because it dealt with common law strict liability, not the Spill Act.

These rulings may only survive until the Legislature or an appellate court decides to overrule or modify them. For the present time and immediate future, however, these rulings will be valuable to the State's NRD program.